**UNITED STATES BANKRUPTCY COURT**                    NOT FOR PUBLICATION
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:                                                           :          Chapter 7

    Maury Rubin,                                        :

                                                              :

                              Debtor.                    :          Case No. 19-14001 (JLG)

------------------------------------------------------------------------x

Fonz Inc.,                                                       :

                                                              :

                              Plaintiff,                 :

                                                              :

v.                                                               :          Adv. P. No.: 20-01062 (JLG)

                                                              :

Maury Rubin,                                                     :

                                                              :

                              Defendant.                 :

------------------------------------------------------------------------x

## POST-TRIAL MEMORANDUM DECISION AND ORDER
## DISMISSING THE COMPLAINT

**A P P E A R A N C E S :**

OFFIT KURMAN LLP
*Attorneys for Plaintiff*
590 Madison Avenue, 6th Floor
New York, New York 10022
By:    Albena Petrakov

BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI LLP
*Attorneys for Defendant*
299 Park Avenue
New York, NY 10171
By:    Alec P. Ostrow

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

**INTRODUCTION**[1]

Maury Rubin ("Rubin" or "Debtor") is the debtor in this case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). He formerly managed and operated the Rubin Businesses, including The City Bakery LLC ("The City Bakery" or "TCB") and City Bakery Brands LLC ("City Bakery Brands" or "CBB"). In 2019, City Bakery Brands and The City Bakery were indebted to Fonz Inc. ("Fonz") under the Fonz Loans in the sum of $1.1 million. In February 2019, prior to the Petition Date, Fonz entered into a Refinancing Transaction with Rubin, The City Bakery, and City Bakery Brands, pursuant to which, Fonz consolidated the Fonz Loans under a consolidated note, with City Bakery Brands, as borrower. PX-1 (the "2019 Consolidated Note"). Rubin and The City Bakery each guaranteed the refinanced indebtedness totaling $1,167,175 (the "Rubin Debt"). PX-2 (the "2019 Guaranty"). Ultimately, Rubin, City Bakery Brands and The City Bakery defaulted on their obligations to Fonz under the Refinancing Transaction.

Fonz contends that in entering into the Refinancing Transaction, Rubin withheld material information that Fonz could not have discovered from its review of the Rubin Businesses' books and records. First, it says that Rubin represented that no litigation was pending or threatened against City Bakery Brands, although at that time, Rubin had received and failed to disclose, a demand letter directed to Rubin, as Managing Member of City Bakery Brands, from Anthony Melfi ("Melfi") and Christopher Parzych ("Parzych"), claiming amounts owed to them under separate promissory notes (the "Melfi Note" and "Parzych Note," respectively), totaling $415,125.32, and threatening litigation if the debts were not repaid. PX-7 (the "Melfi/Parzych

---

[1] Capitalized terms have the meanings ascribed to them herein.

Demand Letter"). Second, in the Debt Schedule annexed by City Bakery Brands to the 2019 Consolidated Note (the "CBB Debt Schedule"), Rubin listed the "Melfi Loan" with an amount due of $270,000, but failed to list the Parzych Note, and understated City Bakery Brands' aggregate debt under the Melfi and Parzych Notes by $150,000 (the $150,000 Debt").[2]

In this adversary proceeding, Plaintiff Fonz seeks a judgment that the Rubin Debt is nondischargeable under sections 523(a)(2)(A) and (B) of the Bankruptcy Code. It contends that Rubin's failure to disclose the Melfi/Parzych Demand Letter when he executed the 2019 Consolidated Note on behalf of City Bakery Brands, constitutes a false representation respecting City Bakery Brands' financial condition under section 523(a)(2)(A). Fonz also alleges that the Rubin Debt is nondischargeable under section 523(a)(2)(B), because the CBB Debt Schedule was materially false due to the omission of the Parzych Note and the $150,000 Debt, and that it relied on the schedule to its detriment in entering into the Refinancing Transaction.

The Court conducted a two-day trial of this adversary proceeding, and has carefully reviewed the parties' post-trial submissions. As explained below, the Court grants judgment to Rubin dismissing Fonz's claims for relief under section 523(a)(2). Rubin's failure to disclose the Melfi/Parzych Demand Letter is an omission respecting Rubin's financial condition. As a matter of law, it is not excepted from discharge under section 523(a)(2)(A). The CBB Debt Schedule is a written statement respecting an insider's financial condition. It is false because it omits the Parzych Note and $150,000 Debt. However, the Court finds, as a matter of fact, that (i) the omission is not material to the accuracy of the CBB Debt Schedule, (ii) Fonz did not rely on the information in the CBB Debt Schedule in entering into the Refinancing Transaction, and (iii) in submitting the

---

[2] Fonz calculates the "$150,000 Debt" as the approximate difference between the $270,000 claim in the CBB Debt Schedule, and the $425,125 damage claim in the Melfi/Parzych Demand Letter.

CBB Debt Schedule, Rubin did not intend to deceive Fonz. The Rubin Debt is not excepted from discharge under section 523(a)(2)(B).

The Court grants judgment in favor of Rubin. The Rubin Debt is dischargeable and has been discharged under section 727(b) of the Bankruptcy Code.

## BACKGROUND[3]

### The Debtor

On December 20, 2019 (the "Petition Date"), Rubin filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this Court.[4] On April 25, 2024, the Court approved the final report of Albert Togut, the chapter 7 trustee.[5] On June 16, 2020, Rubin received a discharge pursuant to section 727 of the Bankruptcy Code.[6]

Rubin was the founder, manager and operator of City Bakery Brands,[7] The City Bakery and a number of other affiliated entities, including Maurybakes, LLC ("MauryBakes") (collectively with CBB and TCB, the "Rubin Businesses"), and eleven "Birdbath" entities, including Birdbath Vandy, LLC ("Birdbath Vandy"). JPTO, Part III, ¶ 4.[8] The Debtor's bankruptcy filing was caused by the failure of those businesses. Tr. Day 2, at 62:4-16 (Rubin).

---

[3] References to "AP ECF No. ___" are to documents filed on the electronic docket of this Adversary Proceeding. No. 20-01062. References to "ECF No. __" are to documents filed on the electronic docket of the Debtor's chapter 7 Case No. 19-14001.

[4] *Chapter 7 Voluntary Petition for Individuals*, ECF No. 1.

[5] *Order Approving Trustee's Final Report And Applications For Compensation*, ECF No. 64.

[6] *Order of Discharge*, ECF No. 39.

[7] City Bakery Brands is the parent company to The City Bakery.

[8] *Amended Joint Pretrial Order*, AP ECF No. 79 ("JPTO").

**Fonz Inc.**

Fonz is a joint stock corporation duly organized under the laws of Japan. It is the exclusive licensee of City Bakery Brands in Japan, with the right to operate restaurants with "The City Bakery" name in Japan. JPTO, Part III, ¶¶ 9-10. It is also a creditor of Rubin on account of the Rubin Debt. On January 18, 2021, it timely filed a proof of claim against Rubin in the sum of $1,167,175. JPTO, Part III, ¶ 23; Claim No. 18-1. That indebtedness arises from Rubin's guaranty of the obligations of City Bakery Brands and The City Bakery to Fonz under the 2019 Consolidated Note and the 2019 Guaranty. Takuya Yoshii ("Yoshii") is Fonz's co-CEO and was Rubin's principal contact with Fonz. The parties agreed to the Refinancing Transaction after Rubin and Yoshii failed to reach agreement on the sale of all or parts of the Rubin Businesses to Fonz.

**The Adversary Proceeding**

On March 23, 2020, Fonz timely commenced this adversary proceeding against Rubin by filing a two-count complaint (the "Complaint") [9] seeking a determination that the Rubin Debt is nondischargeable under section 523(a)(2) of the Bankruptcy Code.[10] The claims at issue in the Complaint arise out of the representations and warranties (the "Reps") in sections 7.5 and 7.6(a) of the 2019 Consolidated Note.

In February 2019, CBB was indebted to Melfi and Parzych under the Melfi Note and the Parzych Note respectively, each in the principal amount of $250,000. JPTO, Part III, ¶¶ 6-7. CBB

---

[9] *Complaint to Determine Non-Dischargeability of Debt* (the "Complaint"), AP ECF No. 1.

[10] In the Complaint, Fonz alleges that the statutory predicates for the adversary proceeding include sections 523(a)(4) and (6) of the Bankruptcy Code. Complaint ¶ 6. In his answer to the Complaint, Rubin admits this allegation, and that answer has not been amended. *See Answer To Complaint With Affirmative Defenses* (the "Rubin Answer"), AP ECF No. 4. The Complaint does not assert any claim for relief under section 523(a)(4) or section 523(a)(6). In the single count in the Complaint, Fonz pleads only a claim under section 523(a)(2). Complaint ¶¶ 24-26. Moreover in its pretrial memorandum, Fonz relies solely on sections 523(a)(2)(A) and (B) in support of the Complaint. *See, e.g.,* Fonz Memo at 9 ("Mr. Rubin's conduct and written statements are actionable under Sections 523(a)(2)A) and 523(a)(2)(B) of the Bankruptcy Code."). Fonz abandoned any claim for relief under section 523(a)(4) and section 523(a)(6) of the Bankruptcy Code.

defaulted under the notes and on February 9, 2019, Melfi and Parzych jointly sent Rubin, as the

Managing Member of CBB, the Melfi/Parzych Demand Letter. It included a demand for payment

of $415,125.32, on or before February 20, 2019, and the promise of litigation if payment was not

timely made. PX-7. Section 7.6(a) of the 2019 Consolidated Note contains a Rep that "Exhibit B

(the schedule of debt) sets forth a list of all Debt of the Borrower and the Subsidiary Guarantors

that is true and correct in all material respects as of the date of this Note." PX-1. Fonz included

that Rep because "it was deeply concerned about the financial status of [Rubin] and the Rubin

Businesses." Complaint ¶ 19. The CBB Debt Schedule annexed to the 2019 Consolidated Note,

included the "Melfi Loan" with an amount due of $270,000. CBB did not list the Parzych Note

and understated the aggregate amount due and owing under the Melfi Note and Parzych Note by

approximately $150,000. *Id.* Section 7.5 of the 2019 Consolidated Note includes a Rep that "[n]o

action, suit, litigation, investigation or proceeding of, or before, any arbitrator or Governmental

Authority is pending or threatened by or against any Borrower Party . . . that would be expected to

have a Material Adverse Effect." *Id.* ¶ 20. Before CBB executed the 2019 Consolidated Note, it

received the Melfi/Parzych Demand Letter, which contained a threat of litigation, but did not

disclose it to Fonz. *Id.* Fonz says that it did not learn of the alleged breaches of the Reps until a

year after it entered into the Refinancing Transaction. It asserts that "[it] negotiated the inclusion

of the [Reps] precisely because a complete understanding of the Rubin Businesses' financial

condition was material to [its] decision-making process as to what sort of negotiated arrangement

would present an acceptable level of financial risk to [it] as a creditor of [Rubin] and the Rubin

Businesses." *Id.* ¶ 21. It maintains that it "reasonably relied on [Rubin's] and the Rubin Businesses'

material misrepresentations in agreeing to the [Refinancing Transaction][.]" *Id.* ¶ 22.

The Rubin Debt arises out of Rubin's guaranty of CBB's and TCB's obligations under the 2019 Consolidated Note and 2019 Guaranty. Fonz contends that debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code because it is "for money, a refinancing and/or an extension obtained by false pretenses, false representations and/or actual fraud[.]" *Id.* ¶ 25. It also contends that the Rubin Debt is nondischargeable under section 523(a)(2)(B) because Rubin "knowingly engaged in obtaining money from [Fonz] through the use of statements in writing that were materially false with respect to the Rubin Businesses' financial condition" and Fonz "reasonably relied upon said information," and Rubin "made the statement with the intent to deceive." *Id.* ¶ 26.

City Bakery Brands, not Rubin, made the representations to Fonz at issue in the Complaint. However, Fonz attributes those statements to Rubin. Fonz contends that "[t]he documentary evidence and testimony at trial indicates that there was no real distinction between Mr. Rubin and CBB," and that Rubin "controlled [City Bakery Brands and The City Bakery]." Fonz F&C ¶¶ 52-53. Rubin does not challenge those contentions, and does not contest the applicability of section 523(a)(2) to the Rubin Debt based on the alleged breaches of the Reps in sections 7.5 and 7.6(b) of the 2019 Consolidated Note. However, Rubin denies Fonz's allegations of wrongdoing.[11]

**<u>The Trial</u>**

The Court conducted a two-day trial in this adversary proceeding.[12] Prior to the commencement of the trial, Rubin and Fonz each submitted a memorandum of law (the "Rubin

---

[11] *See generally* Rubin Answer.

[12] Citations to the trial transcript are to "Tr. Day 1,"and "Tr. Day 2." Those transcripts are filed of record at AP ECF No. 81 and AP ECF No. 80, respectively.

Memo" and "Fonz Memo," respectively),[13] and jointly submitted the JPTO. The trial record

includes Plaintiff's exhibits ("PX"), Defendant's exhibits ("DX"), and twenty-three stipulated

facts. *See generally* JPTO. Rubin, Yoshii, Donald N. Schatz ("Schatz"),[14] and Kristin Edwards

Niarchos ("Niarchos")[15] testified at trial. Following the trial, at the Court's direction,[16] the parties

submitted their respective proposed findings of fact and conclusions of law (the "Rubin F&C" and

"Fonz F&C," respectively),[17] and replies thereto (the "Rubin Reply" and "Fonz Reply,"

respectively).[18] Thereafter, the Court heard arguments from the parties (the "Argument").

**Rubin's Post-Trial Requests For Relief**

        In his post-trial submissions, and in response to the Fonz F&C, Rubin seeks a ruling that

the Court will not credit any of Yoshii's trial testimony because it "[it] is not worthy of this Court's

belief" due to "Yoshii's lack of credibility." Rubin Reply at 10. In addition, Rubin objects to, and

seeks to strike, what he says is a predicate for relief under section 523(a)(2)(A) that Fonz did not

allege in the Complaint or the JPTO. *Id.* at 14-15.

---

[13] *Debtor's Trial Memorandum of Law*, AP ECF No. 76; *Pre-Trial Memorandum of Plaintiff Fonz, Inc.*, AP ECF No. 77.

[14] Don Schatz has an MBA and is a manager of a real estate company. Tr. Day 2, at 6:15-17, 7:8-23 (Schatz). He was an initial investor in the City Bakery and later served as a board member. Tr. Day 2, at 8:16-21, 10:2-6 (Schatz).

[15] Ms. Niarchos served as operations manager at The City Bakery from 2010 to 2012. Tr. Day 1, at 57:16-17 (Niarchos). Following her departure, she re-engaged with Rubin around 2016 as a consultant to assist with compiling materials for a potential sale of The City Bakery. Tr. Day 1, at 57:19-25 (Niarchos). From 2017 through 2019, when The City Bakery closed, Niarchos worked as a W-2 employee reporting directly to Rubin, meeting with him virtually two to three times per week to discuss business matters. Tr. Day 1, at 58:3-22 (Niarchos). Her responsibilities included preparing Excel spreadsheets containing debt schedules and financial projections, coordinating with accountants, and providing information to potential investors and lenders, including Fonz. Tr. Day 1, at 59:16-25, 75:16-24 (Niarchos). After The City Bakery's closure, Niarchos worked briefly with Rubin at Wonderbon Chocolate Company from January 2020 to April 2020. Tr. Day 1, at 59:3-7 (Niarchos).

[16] *Post-Trial Scheduling Order*, AP ECF No. 82.

[17] *Debtor's Proposed Findings of Fact and Conclusions of Law*, AP ECF No. 83; *Plaintiff's Proposed Findings of Fact and Conclusions of Law*, AP ECF No. 85.

[18] *Debtor's Reply to Plaintiff's Proposed Findings of Fact and Conclusions of Law*, AP ECF No. 86; *Reply to Defendant's Proposed Findings of Fact and Conclusions of Law*, AP ECF No. 88.

The Court considers those matters below.

***Yoshii's Trial Testimony***

Yoshii is the sole representative of Fonz who testified at trial. Rubin contends "that for Fonz to meet its burden of proof, the Court must believe Yoshii's testimony." *Id.* at 10. Rubin challenges Yoshii's credibility, and argues the Court should not credit his testimony. *Id.* ([Yoshii's] testimony . . . is not worthy of this Court's belief."). As support, he contends that "[s]everal examples in the record demonstrate Yoshii's lack of credibility." *Id.* He complains that at trial, Yoshii significantly underestimated the number of The City Bakery restaurants operated by Fonz in Japan, initially stating "approximately 20" then "25" when the actual number was "38." *Id.* at 11 (citing Tr. Day 1, at 109:12-16, 111:16-21 (Yoshii)). He also says that at his deposition, Yoshii repeatedly refused to confirm the truth of allegations in the Complaint, *id.* (citations omitted), and that when asked at his deposition what dollar amount of a discrepancy between the amount of the CBB debt set forth in the CBB Debt Schedule and that actually due and owing that he would consider material, Yoshii said more than once that it was $1, *id.* (citation omitted). Finally, he points to a November 2014 email from Yoshii to Rubin's attorney in which Yoshii requested backdating a license agreement and destroying the prior executed version. DX-TT (the "November 2014 Email"). Rubin argues that demonstrates Yoshii's willingness to misrepresent facts. Rubin Reply at 11-12.

Rubin cites several cases to support his contention that Yoshii's actions, particularly the request to backdate a document, warrant disregarding his testimony. In *United States v. O'Keefe*, the Eleventh Circuit upheld a district court's denial of a motion for a judgment of acquittal, finding that defendant's underreporting of his income by claiming certain unreported sums were loans "could have easily been discounted by the jury, since he admitted backdating the promissory

notes." *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987). In *Ethicon, Inc. v. U.S. Surgical Corp.*, after finding an inventor admitted to backdating documents to mislead the Patent and Trademark Office, the court found that the untimely production of a related "black ink drawing" document was too unreliable to be given any weight. *Ethicon, Inc. v. U.S. Surgical Corp.*, 937 F. Supp. 1015, 1026-27 (D. Conn. 1996). In *Aini v. Sun Taiyang Co.*, the court noted that a witness's submission of a backdated document undermined his credibility, though the court's decision did not hinge solely on this factor. *Aini v. Sun Taiyang Co.*, 964 F. Supp. 762, 767 n.4 (S.D.N.Y. 1997), *aff'd sub nom. Topiclear Beauty v. Sun Taiyang Co.*, 159 F.3d 1348 (2d Cir. 1998). In *Medichem, S.A. v. Rolabo*, the Federal Circuit found that a witness's backdating of laboratory notebooks diminished his credibility, in the context of a patent dispute where the timing of invention was critical. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1173 (Fed. Cir. 2006). Finally, in *Capizola v. Vantage International, Ltd.*, the New York Appellate Division found that a witness's destruction of a document relevant to stock ownership undermined his credibility, contributing to the court's reversal of a trial court's dismissal of a shareholder's petition. *Capizola v. Vantage Int'l, Ltd.*, 2 A.D.3d 843, 845-46 (N.Y. App. Div. 2d Dep't 2003).

These cases demonstrate that backdating or destroying documents can, in certain contexts, justify challenging a witness's credibility. In *O'Keefe*, the witness's history of falsifying documents directly related to the matters at issue in the case, leading to discrediting his defense. In *Ethicon*, the court found the inventor's intentional backdating to deceive a federal agency sufficiently egregious to discredit his testimony. Similarly, *Aini* and *Medichem* involved backdating that misled third parties or affected the legal issues at stake, though the courts' rulings were not solely based on the witness's credibility. In *Capizola*, the destruction of a document was one of several factors considered by the court, including inconsistent testimony and implausible

10

explanations, that collectively undermined the witness's credibility. These cases show the impact of such conduct on credibility depends on its relevance to the issues in dispute and the extent to which it reflects intentional deception.

Applying these authorities to this case, the Court finds that Rubin's challenges to Yoshii's credibility do not warrant the harsh sanction of discrediting his testimony. The November 2014 Email is troubling. However, it does not rise to the level of misconduct seen in the cited cases. Unlike *Ethicon*, where the backdating was intended to deceive a federal agency, or *Aini*, where the backdated document misled a third party, Yoshii's request—which he acknowledged was "unusual"—was made in the context of negotiations with Rubin's counsel and was not acted upon. Moreover, this incident occurred in 2014, five years before the Refinancing Transaction and bears no direct relation to the disclosures or representations central to this proceeding. In contrast to *Capizola*, where the destroyed document was critical to proving stock ownership, the unexecuted backdating request here is tangential to the matters at issue herein.

Yoshii's allegedly misleading deposition testimony does not align with the severity of conduct in Rubin's cited cases. The discrepancy in the number of Fonz-operated restaurants (20 or 25, versus 38) reflects an imprecise recollection rather than intentional misrepresentation, and, in any event, is unrelated to the financial disclosures at issue. Yoshii's deposition testimony expressing reluctance with addressing the allegations in the Complaint may or may not be attributable to language barriers or Yoshii's unfamiliarity with legal proceedings, but do not equate to the deliberate falsification seen in *O'Keefe* or *Medichem*. His assertion that a $1 discrepancy would be material is a subjective opinion.

Rubin's contentions, while aimed at undermining Yoshii's credibility, involve matters that are largely tangential to the core issues of material falsity, reliance, and intent under section

523(a)(2). On the facts of this case, the cited cases do not compel a blanket determination that Yoshii's testimony is unreliable, as the alleged misconduct lacks the direct relevance and intentionality present in those cases.

### Predicate For Relief Under Section 523(a)(2)(A)

Fonz asserts that although Rubin discussed proceeding with the sale of The City Bakery business to Fonz, "[t]his litigation revealed that Mr. Rubin did not actually intend to proceed with a sale of the business, but just lured Fonz into believing that he was interested in the sale only to borrow funds from them. The Debtor did not plan to negotiate such a transfer but negotiated with the only goal to receive $2 million dollars from Fonz." Fonz F&C ¶ 31 (citations omitted). Fonz asserts that "[w]hen Mr. Yoshii was communicating to Rubin his proposal about the number of shares that Mr. Rubin would have in the new structure and other terms [relating to the sale of the business], Mr. Rubin's response was 'almost everything here is fine.' PX-45. No other communication was presented suggesting that Mr. Rubin was focusing only on a loan in the summer of 2018 not on discussing any acquisition." *Id.* ¶ 32. Fonz asserts that "[w]hile none of [Rubin's] responses to email communications from Fonz and its counsel suggested that the only transaction negotiated was a loan and not a sale of certain stores/entities, [Rubin] shared with [Niarchos] that Fonz was going to send funds for a 'loan predicated on a purchase but the trick will be to not go thru w that.' PX-47." *Id.*

Rubin maintains those allegations (the "Fonz Allegations") cannot support a claim for relief under section 523(a)(2)(A) based on false pretenses. He argues that "[a]lthough false pretenses is mentioned in the [C]omplaint, the specific conduct that is now alleged to constitute false pretenses is not. Neither is it mentioned in the [JPTO]." Rubin Reply at 15. He also contends that the specific exhibits in support of the Fonz Allegations are not enumerated in the JPTO. *Id.* at

14-15. Rubin argues that the Fonz Allegations cannot be a predicate for relief under section 523(a)(2)(A), unless Fonz is authorized to amend the Complaint under Rule 15(b) of the Federal Rules of Civil Procedure[19] to assert those allegations. He contends that Fonz cannot state grounds for such relief.

As stated by the Second Circuit:

> Fed. R. Civ. P. 15(b) permits a district court to amend pleadings after trial to conform to the evidence produced at trial. Such a motion should be granted, however, only if the party against whom the amendment is offered will not be prejudiced by the amendment. Generally, introducing new claims for liability on the last day of trial will prejudice the defendant.

*Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) (internal quotations and citations omitted). Rubin maintains that "[i]t is a surprise and indeed an ambush to have to confront these [new] exhibits now as evidence of Fonz's case in chief," and that an amendment to the Complaint to add the Fonz Allegations in support of a new ground of liability "is highly prejudicial." Rubin Reply at 15.

The Court concurs with Rubin that the Fonz Allegations are not alleged in the Complaint or included in the JPTO. Moreover, the Court finds that Rubin's arguments why Fonz should be denied leave to amend the Complaint under Rule 15(b) are persuasive. However, the Court need not resolve this issue. During Argument, Fonz advised the Court that it not seeking relief in this

---

[19] Rule 15(b) states, as follows:

(b) Amendments During and After Trial.

(1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

Fed. R. Civ. P. 15(b). Rule 15(b) is made applicable herein by Rule 7015 of the Federal Rules of Bankruptcy Procedure.

adversary proceeding on the basis of whether Rubin did not intend to proceed with a sale of the business. The Court will not consider the Fonz Allegations and exhibits submitted in support of those allegations as part of Fonz's case in chief.

*     *     *     *

The merits of the Complaint are before the Court. In short, Fonz seeks a determination that the Rubin Debt is nondischargeable; Rubin seeks a determination that the Rubin Debt is dischargeable and has been discharged. JPTO, Part I, Nature of the Case. To summarize, based on the Complaint and the parties' pre and post-trial submissions to the Court, and matters raised by the parties at trial and during post-trial Argument, the issues before the Court are, as follows:

> (i) whether CBB's failure to disclose the Melfi/Parzych Demand Letter, in breach of the Rep in section 7.5 of the 2019 Consolidated Note, is grounds for denying the discharge of the Rubin Debt under section 523(a)(2)(A) of the Bankruptcy Code, and

> (ii) whether CBB's failure to disclose the Parzych Note, and the $150,000 Debt, in the CBB Debt Schedule, in breach of the Rep in section 7.6 of the 2019 Consolidated Note, is grounds for denying the discharge of the Rubin Debt under section 523(a)(2)(B) of the Bankruptcy Code.

Based upon the trial record and for the reasons set forth below, the Court finds that Fonz has not met its burden of proof under either section 523(a)(2)(A) or (B) of the Bankruptcy Code. The Rubin Debt is dischargeable and has been discharged under section 727(b) of the Bankruptcy Code. This decision constitutes the Court's findings of fact and conclusions of law based on all of the evidence.

## **JURISDICTION**

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the

United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## FINDINGS OF FACT[20]

### The City Bakery and Related Businesses

#### *The City Bakery*

In December 1990, Rubin founded The City Bakery, as a one-location retail bakery on East 17th Street, New York, New York. Rubin was one of seven investors and the initial investment in the business totaled $330,000. Tr. Day 2, at 65:3-7 (Rubin). Rubin's share was $25,000, furnishing him with a 21.67% ownership percentage in the business. Tr. Day 2, at 65:3-7, 68:19-23 (Rubin). Rubin served as the manager, shopkeeper, and baker of The City Bakery and ran all aspects of its operations, including dealing with suppliers and vendors. Tr. Day 2, at 67:20-68:6 (Rubin). For the first three years of its operations The City Bakery broke even. It became profitable in its fourth year and remained so in the ensuing eighteen consecutive years. Tr. Day 2, at 67:5-8 (Rubin).

In 2001, The City Bakery expanded its business. First, Rubin moved The City Bakery operations to a larger location on 3 West 18th Street, New York, New York (the "Flagship Store") which elevated the bakery's profile, making it "a real part of the food world nationally" and "a destination" that attracted visitors from across the globe. Tr. Day 2, at 71:10-72:19 (Rubin). After this move, The City Bakery business expanded into wholesale operations, consumer packaged goods, and a catering business. Tr. Day 2, at 72:20-73:25 (Rubin).

---

[20] These factual findings are based on the credible evidence presented to the Court at trial in this matter.

### *Birdbath Green Bakery*

In 2001, from an offsite kitchen location, The City Bakery opened a small, unnamed retail operation, which became popular in its own right. Eventually, it was named Birdbath Green Bakery ("Birdbath"). Tr. Day 2, at 73:11-25 (Rubin).

### **The City Bakery And Fonz Enter Into License Agreements**

Rubin considered expanding The City Bakery's operations internationally, and in particular, focused on licensing The City Bakery operations in Japan. In 2010, he went to Japan and over a period of seven days met nine potential Japanese licensees, including Fonz. Tr. Day 2, at 77:15-78:8, 79:2-6 (Rubin). Ultimately, Rubin selected Revamp as City Bakery's licensee. However, due to the aftermath of the 2011 earthquake and tsunami in Japan, the arrangement with Revamp never was finalized. Tr. Day 2, at 77:9-25 (Rubin).

### *The Fonz 2013 License Agreement*

In 2012, Fonz contacted Rubin with a project proposal. In April 2013, City Bakery Brands granted Fonz an exclusive non-assignable license for a term of ten-years, to operate The City Bakery in the territory limited to the cities of Tokyo and Osaka, Japan. DX-D (the "2013 License Agreement"); *see also* Tr. Day 2, at 79:11-80:19 (Rubin). The license agreement called for Fonz to pay an initial fee of $100,000, and a royalty of 1% of gross revenues. It authorized Fonz to operate The City Bakery in Tokyo and Osaka, subject to CBB's strict control over the design and interior of the bakery and the food products and merchandise sold at the bakery. In April 2013, Fonz, as licensee, opened two businesses in Osaka: The City Bakery at Grand Front Plaza, and The City Bakery/Brasserie Rubin. In November 2013, Fonz opened a second location of The City Bakery, in Tokyo, Japan at Shinagawa train station. JPTO, Part III, ¶¶ 10-12.

***The Fonz 2015 License Agreement***

In 2015, Fonz and City Bakery Brands revised the license arrangement. First, the parties amended the 2013 License Agreement, as of March 5, 2015, to make the royalty arrangement a one-time payment of ¥25,165,000, which the parties agreed was $209,481.40, and the royalty percentage 5% while the 2013 License Agreement was in effect. DX-E (2013 License Amendment). Second, the parties executed the following agreements, effective as of March 12, 2015: (i) a license agreement between City Bakery Brands and Brands Pte. Ltd., a limited private company incorporated under the laws of Singapore ("CB Singapore"), a Fonz affiliate, DX-F (the "2015 License Agreement"); (ii) a sublicense agreement between CB Singapore and Fonz, DX-G; and (c) a consulting agreement between Rubin and Fonz, DX-H.

The 2015 License Agreement gave Fonz (through CB Singapore) an exclusive non-assignable license for a term of indefinite duration to operate The City Bakery locations in the territory comprised of all of Japan. Still, Rubin and CBB retained control over (i) the design, appearance, décor, and operations of food products and merchandise with The City Bakery brand, and (ii) Fonz's use of The City Bakery trademark and intellectual property, and of Rubin's name, image and likeness. They also had the right to inspect the branded operations for compliance with the agreement. The royalty was a fixed amount of ¥150,000,000, payable in two installments of ¥75,000,000. By 2019, under that agreement, Fonz had expanded to approximately 38 The City Bakery locations throughout Japan, generating around $25 million in annual revenue. Tr. Day 1, at 109:12-15, 111:16-25 (Yoshii). These locations included various concepts beyond the original The City Bakery format, such as "Brasserie Rubin," "Bistro Rubin," and "Bar and Burger Rubin" Tr. Day 1, at 110:21-111:7 (Yoshii).

**The City Bakery Financial Difficulties**

For the first dozen or so years of its operations, The City Bakery did not require external financing except for (i) a $450,000 bank loan, which Rubin personally guaranteed, when the bakery moved to the Flagship Store location, and (ii) a bank loan to develop the catering business. Both loans were repaid ahead of schedule. Tr. Day 2, at 86:4-18 (Rubin). During this period, The City Bakery financed its growth primarily through operating profits.[21]

Birdbath eventually expanded to nine locations throughout New York City. Tr. Day 2, at 74:3-8 (Rubin). Most of the Birdbath locations were profitable, particularly those in the West Village, SoHo, Tribeca, and the Upper West Side. Tr. Day 2, at 74:11-22 (Rubin). However, the expansion of Birdbath to Birdbath Vandy, a midtown Manhattan location near Grand Central Terminal, in 2013, caused financial problems for The City Bakery. Tr. Day 2, at 74:20-75:14 (Rubin).

Unlike the other Birdbath locations that were inexpensive to build and, generally, quickly profitable, Birdbath Vandy was The City Bakery's first full construction project through the New York City Department of Buildings. Tr. Day 2, at 74:24-75:3 (Rubin). The project faced an eight-month approval delay with the department, during which time rent at the location continued to accrue. Tr. Day 2, at 75:5-12 (Rubin). The construction delay created unexpected costs for Birdbath Vandy and a cash crisis for The City Bakery operations. The initial budget of $175,000 for the project ultimately doubled to approximately $350,000. Tr. Day 2, at 74:22-75:14 (Rubin).

---

[21] Rubin testified that "City Bakery from there generated—it was kind of a perfect picture of a small business growing. It grew from cash proceeds. It grew from profit. And we reapplied..." Tr. Day 2, at 86:9-11 (Rubin). Prior to the financial issues that began in 2013, City Bakery had minimal debt. According to Rubin, "It was not a debt - it was an equity-based and profit-driven company." Tr. Day 2, at 86:19 (Rubin).

That created what Rubin characterized as "a disaster" that "put a hole in the ground in City Bakery's finances that became the start of everything bad." Tr. Day 2, at 75:12-14 (Rubin).[22]

Initially, Rubin used funds from The City Bakery and City Bakery Brands to cover the Birdbath Vandy construction costs and capital expenditures. However, The City Bakery became financially unstable. Rubin was not able to obtain conventional bank financing to cover the expenses. He then sought to borrow money from various third parties. Tr. Day 2, at 85:14-87:18 (Rubin).

**The Third Party Financing**

***The Melfi/Parzych Notes***

In December 2013, at Rubin's request, Melfi and Parzych each made a $250,000 loan to City Bakery Brands. JPTO, Part III, ¶¶ 5-7; PX-4 (Melfi Note); PX-5 (Parzych Note).[23] Each loan is secured by, among other things, a lien on Rubin's entire direct interest in CBB. PX-6 (Security and Pledge Agreement).

Although CBB was indebted to Melfi and Parzych each in the sum of $250,000, Rubin always referred to the Melfi Note and Parzych Note in the aggregate as the $500,000 "Melfi Loan." Tr. Day 2, at 91:17-19, 110:6-8 (Rubin). Rubin made payments on account of this aggregated debt to Melfi, with whom he exclusively dealt in connection with this debt. Until 2019, Rubin heard no complaint from Parzych about not receiving payments on the Parzych Note. Tr. Day 2, at 91:10-16 (Rubin).

---

[22] Birdbath Vandy construction expenses created financial problems for The City Bakery. However, Birdbath Vandy turned a profit after its first year. Tr. Day 2, at 75:12 (Rubin).

[23] The notes are both dated as of December 26, 2013, and both state, "The note is one of a series of convertible secured notes (the "2013 Notes") issued to investors in the aggregate principal amount of Five Hundred Thousand Dollare ($500,000.00)."

*Friends and Family Loans*

In addition to the financing from Melfi and Parzych, Rubin obtained loans aggregating approximately $870,000 from a group of five individuals.[24] Together with Melfi and Parzych, those individuals became known as the "Friends and Family" lenders. Tr. Day 2, at 91:21-15, 92:1-10 (Rubin). However, those loans were not sufficient to alleviate the cash crisis at The City Bakery.

*Merchant and Small Business Loans*

Rubin was able to arrange for a merchant loan from American Express, and small business loans from lenders, such as Argus Capital Funding, Capital Advance Services, Kings Cash Group, and Fundkite (the "Small Business Lenders"). The terms of those loans called for high interest rates and fees; and were paid by daily debits from the bank accounts of The City Bakery or City Bakery Brands. Tr. Day 2, at 96:12-20 (Rubin). Rubin sought to replace these Small Business Lenders with lenders that would provide less onerous terms. Tr. Day 2, at 96:21-25, 97:1-4 (Rubin).

## Fonz Provides Financing For The City Bakery

Beginning in 2015**,** in the wake of its successful development of The City Bakery operations in Japan, Fonz focused on acquiring an interest in The City Bakery's New York businesses. Tr. Day 2, at 97:6-12 (Rubin); Tr. Day 1, at 117:3-5 (Yoshii). In particular, Fonz sought to acquire the Flagship Store on 18th Street. Tr. Day 1, at 16:22-17:13 (Yoshii). In 2015, at Yoshii's request, Rubin authorized a member of Fonz's accounting staff to review City Bakery Brands financial records in New York. At that time, Rich & Bander ("R&B") were City Bakery Brands' accountants. Eventually, the accounting firm, "RMG" replaced R&B as City Bakery Brands' accountants. The Fonz representative spent a work week with R&B reviewing the

---

[24] Those individuals are: Frear, Yelling, Gerten, Orans and Lilling.

financial records. Yoshii also visited R&B, where he met with R&B's principal, Jon Bander. Thereafter, Yoshii remained in direct contact with him by telephone and email. JPTO, Part III, ¶ 13. At that time, Rubin also authorized Fonz to receive electronic access to QuickBooks, the accounting software used by The City Bakery. That access continued through the middle of 2019. Tr. Day 2, at 114:20-25 (Rubin); Tr. Day 1, at 106:1-6 (Niarchos); Tr. Day 1, at 22:7-13 (Yoshii).

In 2018, The City Bakery was facing serious liquidity problems. The company was out of operating cash and the daily interest payments on several loans exceeded its daily revenue. PX-17.[25] In March 2018, Rubin reached out to Yoshii concerning financing or a potential transaction with Fonz. JPTO, Part III, ¶ 14; Tr. Day 2, at 98:7-20 (Rubin). Over the next several months, Fonz, through Yoshii, and The City Bakery, through Rubin and Schatz, discussed both Fonz's financing The City Bakery operations, and its acquisition of the Rubin Businesses. Rubin was clear that The City Bakery had an urgent need for funding. Fonz agreed to provide the funding while it simultaneously proceeded with its due diligence. To that end, Fonz was particularly focused on satisfying the high interest rate loans from Small Business Lenders, as they were a threat to the viability of the business. Tr. Day 1, at 31:1-12 (Yoshii).

In response to Rubin's request for financing, during the period of July 2018 through November 2018, Fonz made three secured, short-term loans to The City Bakery/City Baking Brands (collectively, the "Fonz Loans"). On July 13, 2018, The City Bakery issued a secured promissory note to Fonz for $200,000. DX-I (the "July Promissory Note"). The note had an interest rate of 15% and maturity date of September 30, 2018. *Id.* The loan documents included two

---

[25] At or about that time, The City Bakery was servicing high interest loans to a number of Small Business Lenders, including Capital Advance, Fundkite, Kalamata, Kings Cash Group. Tr. Day 1, at 69:6-11(Niarchos). In September 2018, these payments alone exceeded $70,000. PX-10 (Amalgamated Bank Statements). Separately, The City Bakery was making monthly payments of approximately $19,000, on account of its Amex merchant loan. *Id.*

security agreements, both with registered trademarks of The City Bakery as the collateral. *See* DX-K; DX-L. The promissory note contained no representations as to the debt level of either The City Bakery or City Bakery Brands.

Fonz's due diligence process proceeded in parallel with its financing. On August 27, 2018, Fonz sent its preliminary due diligence list in connection with the contemplated transactions with City Bakery Brands and The City Bakery. In September 2018, Niarchos, under Rubin's direction, started providing Fonz the requested information. JPTO, Part III, ¶ 16-17. The books of the Rubin Businesses included the general ledger, the ongoing accounts payable, accounts receivable, profit and loss statements, cash flow statements, and balance sheets. Tr. Day 2, at 213:16-214:17 (Rubin). At that time, Fonz had direct access to the books and records of the Rubin Businesses on QuickBooks. Tr. Day 1, at 106:1-7 (Niarchos). Rubin directed Niarchos to provide Fonz with all requested information, without restraint. Tr. Day 1, at 103:5-6 (Niarchos). Yoshii and Fonz's retained professionals were never refused access to the books and records of Rubin or his companies. Tr. Day 1, at 160:4-14 (Yoshii). However, by email dated August 20, 2018, Rubin instructed Niarchos not to provide Yoshii with access to certain "Melfi Loan" documents. PX-16 (the "August 20, 2018 Email"). Ultimately, Yoshii did not receive documents relating the "Melfi Loan."

On September 25, 2018, The City Bakery issued a secured promissory note to Fonz for $100,000. DX-M (the "September Promissory Note"). The note had an interest rate of 15% and maturity date of October 5, 2018. *Id.* It contained no representations as to the debt of The City Bakery or City Bakery Brands. *Id.* On September 26, 2018, the parties signed Amendment No. 1 to July Promissory Note, DX-N, changing the maturity date of the July Promissory Note to October 5, 2018, to coincide with the maturity date of the September Promissory Note.

After continued due diligence, in an email dated October 3, 2018, PX-22, Fonz proposed a transaction pursuant to which Fonz would exchange the then existing debt under the July and September Promissory Notes, and advance an additional $300,000 to City Bakery Brands for a secured promissory note from City Bakery Brands in the sum of $700,000 (the "October 2018 Transaction"). Fonz was clear that the "amount loaned must be sufficient to repay the secured factoring agreements [i.e., the Small Business Lenders] and past due taxes and the loan funds must be used to pay off those liabilities." *Id.* at p. 3. Fonz noted that "all secured creditors would be repaid under the $700K Note." *Id.* The October 2018 Transaction contemplated that Fonz would acquire the Rubin Businesses and intellectual property As relevant, the proposal stated "[a]s an alternative to immediate repayment/foreclosure, we propose an acquisition whereby CBB will sell its membership interests and its [intellectual property] to a Newco and then CBB will liquidate itself." *Id.* Rubin did not agree to that transaction.

On November 20, 2018, City Bakery Brands issue a secured, short-term promissory note to Fonz for $540,000 DX-R (the "November Promissory Note," together with the July and September Promissory Notes, the "Fonz Notes") The note restricted use of the proceeds to pay certain targeted secured indebtedness,[26] and had an interest rate of 15% and maturity date of December 10, 2018. *Id.* The loan documents included a security agreement with all personal and fixture property, including goods, instruments, and accounts as the collateral. DX-Q. The November Promissory Note contained a representation in section 8.8 that the schedule of debt

---

[26] Under November Promissory Note, the borrower was required to use the proceeds of the loan to repay debt pursuant to factoring agreements either (a) to which the borrower was a party or (b) pursuant to which the borrower's assets or the assets of any of the borrower's subsidiaries were offered as security and past due federal or state tax obligations of the borrower or its subsidiaries. The loan proceeds were not to be used for payments to Rubin or any of his investors or the borrower's "Friends and Family" obligations as designated by Rubin. JPTO, Part III, ¶ 18.

attached as Exhibit B was true and correct in all material respects.[27] As relevant, that schedule did

not list the Parzych Note, but listed the "Melfi Loan" in the principal amount of $250,000, with a

current balance of $270,000.

In November 2018, Schatz became directly involved in the discussions with Fonz. Tr. Day

2, at 11:16-19 (Schatz). On November 26, 2018, Rubin, Yoshii, and Schatz met at a Chase bank

branch in Montclair, New Jersey so that Yoshii could watch Rubin pay the debts of the merchant,

and Small Business Lender loans with the proceeds of the November Promissory Note. Rubin

made the payments from his laptop computer that he brought to the meeting. Tr. Day 2, at 12:10-

13, 14:6-16 (Schatz); Tr. Day 1, at 34:16-21 (Yoshii).

**The City Bakery and City Bakery Brands Default Under The Fonz Notes**

The City Bakery and City Bakery Brands defaulted under the Fonz Notes. Tr. Day 2, at

131:2-16 (Rubin). On December 4, 2018, Rubin, Schatz, and Yoshii met to discuss the status of

the relationship between Fonz and The City Bakery and City Bakery Brands. The parties discussed

options for working together to unwind the loan transactions, but did not reach a resolution. Tr.

Day 2, at 18:10-14 (Schatz); Tr. Day 2, at 118:3-7 (Rubin). On December 12, 2018, Fonz, through

counsel, sent letters to Rubin and Schatz containing notices of default for each of the Fonz Notes.

DX-BB. Both letters stated, "If corrective action is not taken by 9 am on Thursday, December 13,

2018, Fonz will take appropriate actions to protect its interests." *Id.* On or shortly after December

13, 2018, Fonz did not take any action "to protect its interests" under any of the notes. Tr. Day 1,

at 130:20-131:7 (Yoshii); Tr. Day 2, at 20:11-16 (Schatz); Tr. Day 2, at 118:20-24 (Rubin).

---

[27] This was the first such promissory note that contained a representation regarding the debt of The City Bakery
or City Bakery Brands. Tr. Day 1, at 124:11-13 (Yoshii); Tr. Day 2, at 108:3-7 (Rubin).

On December 17, 2018, Schatz met privately with Yoshii. At that meeting, Yoshii outlined an acquisition proposal, in which Fonz would take ownership of the company and Rubin would have a 5-10% interest; the parties also discussed issues and problems with an extended payoff of the Fonz Loans, which included Fonz receiving compensation in the form of rights to intellectual property in certain Asian countries, including Thailand and Singapore, as well Australia and New Zealand. *See* DX-DD (the "December 2018 Acquisition Proposal"); *see also* Tr. Day 2, at 24:1-12 (Schatz).

On December 20 and 21, 2018, Yoshii and Schatz exchanged emails. *See* DX-EE. In the first such email to Schatz, Yoshii confirmed that an acquisition of the Rubin Businesses was off the table, and proposed different lengths for an extension of the maturity dates under the Fonz Loans in exchange for granting Fonz intellectual property rights in different territories. *Id.* Schatz described the proposals as follows:

> Basically, the larger transaction was that Fonz would purchase the bakery for $1.00 and give the right for Maury to repurchase for a dollar at these different dates in exchange for these rights.
>
> To these different dates there would be intellectual property rights given. If they are not – if the repurchase doesn't happen by February 27th, it would be the Asia Pacific or the Pac Rim. June, that plus Canada or the West Coast, as well as the Pacific Rim.

Tr. Day 2, at 26:5-15 (Schatz).

On December 24, 2018, Yoshii sent an email to Schatz with a term sheet (the "December 2018 Term Sheet") containing a "Summary Of Terms Of Promissory Note Exchange And Trademark Purchase." DX-FF. The email included a request that a consolidated promissory note and other agreements be signed by "12/27/2018." The December 2018 Term Sheet included provisions for:

- a note exchange;

- a personal guaranty by Rubin;

- security;

- an interest rate of 15% and a maturity date of January 15, 2019;

- the release of Rubin's personal guaranty upon entering into a binding agreement for all the equity interests in The City Bakery and MauryBakes;

- a sale of the registered Japanese "City Bakery" trademark;

- an amendment to the master license agreement; and

December 2018 Term Sheet.

The December 2018 Term Sheet also included an "Overview Of Subsequent Transactions," with provisions for:

- a sale of The City Bakery and MauryBakes to Fonz for $1, with a repurchase option of $1, if the indebtedness to Fonz is paid with interest by December 16, 2019;

- an employment arrangement for Rubin at $15,000 per month;

- a 4-year non-solicitation agreement of any City Bakery Brands personnel;

- a non-competition agreement;

- a sale to Fonz for $1 of all intellectual property in Canada; and

- a sublicensable trademark license to Fonz for the states of Washington, Oregon, Idaho, California, Nevada, and Alaska for $1.

*Id.* Neither the email nor the term sheet mentioned any representation as to how much was owed by The City Bakery or City Bakery Brands or the accuracy of any schedule of debts of such companies.

On December 26, 2018, Yoshii emailed Schatz a set of documents, including the December 2018 Term Sheet. Yoshii's cover email stated: "Please have Maury sign the attached documents by the end of tomorrow 12.27." DX-GG. The attached documents included:

- an Intellectual Property Acquisition Agreement, with a Schedule 2 containing more than 60 countries or portions of countries as included in the defined "Territory";

- a Trademark Assignment Agreement;

- the December 2018 Sheet;

- a Guaranty;

- a Note Exchange Agreement;

- a Secured Promissory Note; and

- a calculation of the amount owed to Fonz plus accrued interest.

DX-GG-1-7. Rubin did not sign the proposed agreements by December 27, 2018, or anytime thereafter. Tr. Day 1, at 128:24-129:15 (Yoshii); Tr. Day 2, at 120:12-13 (Rubin).

On January 6, 2019, Yoshii sent an email to his counsel requesting that she "Please proceed with my complaint." DX-II. No complaint was filed on January 6, 2019, or shortly thereafter. Tr. Day 1, at 133:1-3 (Yoshii); Tr. Day 2, at 33:7-9 (Schatz); Tr. Day 2, at 120:17-20 (Rubin).

### The Melfi/Parzych Demand Letter

On February 8, 2019, in the Melfi/Parzych Demand Letter, counsel for Melfi and Parzych noticed a default under both the Melfi Note and Parzych Note. JPTO, Part III, ¶ 19. The demand letter, addressed to City Bakery Brands to the attention of Rubin, sought an amount due and payable of $415,125.32.

**The February 27, 2019 Refinancing Transaction**

In February 2019, Fonz and Rubin resolved to refinance the Fonz Loans (the "Refinancing Transaction"). On or about February 27, 2019, in furtherance of that transaction, Rubin executed (i) a Note Exchange Agreement, PX-3, (ii) the 2019 Consolidated Note, PX-1, (iii) a Security Agreement, on behalf of City Bakery Brands, The City Bakery, and Maurybakes (the "Security Agreement"), DX-S, and (iv) the 2019 Guaranty, PX-2. *See* JPTO, Part III, ¶ 20. Rubin also signed (i) an Intellectual Property Acquisition Agreement with CB Singapore, on behalf of The City Bakery Brands and City Bakery, DX-U, and (ii) an Amendment No. 1 to License Agreement with Fonz, on behalf of himself, City Bakery Brands and The City Bakery, DX-T (the "2015 License Amendment"). *See* JPTO, Part III, ¶ 20.

Under the Refinancing Transaction, Fonz did not advance new funds. It extinguished the Fonz Notes and consolidated the Fonz Loans under the 2019 Consolidated Note.[28] The principal amount of the note was $1,167,175. PX-1. It accrued interest at 15%, and had a June 13, 2019 maturity date. *Id.* In the 2019 Guaranty, Rubin personally guaranteed Fonz the payment of the 2019 Consolidated Note. PX-2. In the Security Agreement, Fonz received a security interest in collateral of City Bakery Brands and the Subsidiary Guarantors, consisting of all their personal and fixture property of every kind and nature, including goods, instruments, and accounts. DX-S. The Intellectual Property Acquisition Agreement transferred the Japanese registration of the

---

[28] As relevant, in its seventh recital of "WHEREAS" clause, the Note Exchange Agreement provides that "the Parties have agreed to exchange (the "Exchange") (i) the Existing Notes and (ii) Fonz's waiver of defaults under the Existing Notes, including the Specified Defaults, for a single secured promissory note in the principal amount of $1,167,175.00 . . . ." In its ninth recital or "Whereas" clause, it provides that "as consideration and an inducement for Fonz to enter into this Agreement and conduct the Exchange, (i) CBB and TCB are entering into that certain Intellectual Property Acquisition Agreement, dated as of the date hereof, . . . and (ii) CBB is entering into that certain Amendment No. 1 to License Agreement, dated as of the date hereof . . . ." Finally, in Section 1, agreement provides that the "recitals set forth above are incorporated herein by reference," and in Section 2, that "Fonz hereby conveys, assigns and transfers to CBB and TCB, as applicable, the Existing Notes for cancellation . . . ." PX-3.

trademark for The City Bakery from City Bakery Brands and The City Bakery to CB Singapore.

DX-U. The Amendment No. 1 to License Agreement made the following changes to the 2015

License Agreement:

      a.   the territory became Japan, Singapore, Thailand, the Philippines and Vietnam;

      b.   the license became assignable and sublicensable;

      c.   the provisions requiring interior and design elements to conform to preapproved criteria, recognizing the licensor's vital interest in the design, appearance, décor, and operations of food products and merchandize with The City Bakery brand, and granting the licensor the right to inspect the branded operations for compliance were eliminated;

      d.   the requirement for prior written approval of the uses of The City Bakery trademark, and the recognition that the related intellectual property and work product were property of the licensor were eliminated; and

      e.   the termination rights of the licensor for breach of any obligation by the licensee were eliminated.

DX-T. Under the amendment, Fonz retained the right to use Rubin's name, image, and likeness

for the duration of the term.

**<u>The 2019 Consolidated Note Reps</u>**

Section 7.5 of the 2019 Consolidated Note is titled "No Litigation." It states, as follows:

> No action, suit, litigation, investigation or proceeding of, or before any arbitrator or Governmental Authority is pending or threatened by or against any Borrower Party or any of the property or assets of any Borrower Party (a) with respect to any Loan Documents or any of the transactions contemplated hereby or thereby or (b) that would be expected to have a Material Adverse Effect.

2019 Consolidated Note § 7.5. Section 7.6 is titled "Existing Debt." *Id*. § 7.6. Section 7.6(b) states:

> <u>Exhibit B</u> (the "Schedule of Debt") sets forth a list of all Debt of the Borrower and the Subsidiary Guarantors that is true and correct in all material respects as of the date of this Note.

*Id.*

On February 27, 2019, CBB executed the 2019 Consolidated Note, but did not disclose the Melfi/Parzych Demand Letter. The CBB Debt Schedule disclosed the "Melfi Loan" with a principal amount of $250,000, and current balance of $270,000. It did not list the Parzych Note and did not account for the $150,000 Debt.

## Melfi/Parzych Sue Rubin and Obtain Default Judgment

In April 2019, Melfi and Parzych filed a lawsuit against City Bakery Brands and Rubin seeking $415,125.32 in unpaid principal and interest under the Melfi and Parzych Notes (the "Debt Collection Action"). JPTO, Part III, ¶ 21. Rubin was aware of the Debt Collection Action, and received timely notice of the lawsuit. However, neither Rubin nor City Bakery Brands responded to the action, and Melfi and Parzych entered default judgments against them. Tr. Day 2, at 232:9-233:9 (stipulation of counsel). On or about June 24, 2019, counsel submitted a statement for judgment in favor of Melfi and Parzych and against City Bakery Brands and Rubin in the amount of $432,465.33. PX-8.

## Defaults Under the Refinancing Transaction

When the 2019 Consolidated Note came due on June 13, 2019, Rubin, The City Bakery, and City Bakery Brands defaulted under their respective obligations under the 2019 Consolidated Note and 2019 Guaranty. Tr. Day 2, at 131:2-16 (Rubin).

## Rubin Commences His Chapter 7 Case

Rubin operated the City Bakery Brands until October 19, 2019 and was on its payroll until he closed the business. Rubin F&C ¶ 81; JPTO, Part III, ¶ 22. On December 20, 2019, Rubin filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, together with his Bankruptcy Schedules, DX-B, with the Court. JPTO, Part III, ¶ 1. The Bankruptcy Schedules list

unsecured, nonpriority debts to Melfi and Parzych in the amount of $216,232.67 each, as judgment

debts, not designated as contingent, unliquidated or disputed. Bankruptcy Schedules at 32. On June

16, 2020, Rubin received a discharge in bankruptcy, pursuant to section 727 of the Bankruptcy

Code. JPTO, Part III, ¶ 2.

### CONCLUSIONS OF LAW

Section 523(a)(2) excepts from discharge debts arising from various forms of fraud.

Section 523(a)(2) states that a discharge under relevant provisions of the Bankruptcy Code does

not discharge an individual debtor from any debt

> for money, property, services, or an extension, renewal, or refinancing of credit,
> to the extent it was obtained by –
>
> (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). The categories of fraud represent independent bases for declaring a debt

nondischargeable; each has specific elements that the creditor must establish. *In re Donghee Choi*,

No. 17-31540, 2019 WL 11031716, at *5 (Bankr. N.D.N.Y. Dec. 20, 2019); *In re Cahill*, No. 15-

72418, 2017 WL 713565, at *9 (Bankr. E.D.N.Y. Feb. 22, 2017).[29] However, scienter—fraudulent

---

[29] The Court summarized the elements for each ground for relief under section 523(a)(2)(A), as follows:

> To establish that a money debt was incurred under "false pretenses," the plaintiff must show (1) an
> implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by
> the defendant; (3) creating a contrived and misleading understanding of the transaction on the part
> of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property, or credit to
> the defendant. To prove "false representation," the plaintiff must present proof of a false or
> misleading statement made with intent to defraud and justifiable reliance by a creditor. . . . To show
> "actual fraud," the plaintiff must generally establish the "five fingers of fraud," that is proof that the
> debtor (1) made a false representation (2) while knowing it was false (3) with intent to deceive the
> creditor; plus the creditor (4) justifiably relied on the misrepresentation; and (5) suffered pecuniary
> damages as a result.

*City of Atl. City v. Drummon (In re Drummon)*, Case No. 11-62156, Adv. Pro. No. 19-01211, 2023 WL 8291564, at
*15 (Bankr. S.D.N.Y. Nov. 30, 2023) (internal case quotations and citations omitted); *see Pergament v. Diamond
(In re Diamond)*, Case No. 20-71878-reg, Adv. Pro. No. 20-8175-reg, 2024 WL 4099893, at *5 (Bankr. E.D.N.Y.
Sept. 5, 2024) (same).

intent—is common to all species of fraud. In each instance, the creditor must establish the debtor's

intent to deceive. *Honey Do Men Gutters, Inc. v. Gumbs* (*In re Gumbs*), 663 B.R. 227, 237 (Bankr.

S.D.N.Y. 2024).[30] It is settled that "[o]missions of fact can qualify as false representations [under

section 523(a)(2)(A)]: '[a] false representation can be shown through either an express statement

or through an omission where the circumstances are such that disclosure is necessary to correct

what would otherwise be a false impression.'" *Parklex Assocs. v. Deutsch (In re Deutsch)*, 575

B.R. 590, 599 (Bankr. S.D.N.Y. 2017) (quoting *Signature Bank v. Banayan* (*In re Banayan*), 468

B.R. 542, 574-75 (Bankr. N.D.N.Y. 2012) (citations omitted)). Moreover, "[f]alse pretense do[es]

not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the

part of the debtor can constitute misrepresentations for purposes of nondischargeability where

circumstances of the case are such that omissions or failure to disclose create a false impression

which is known by the debtor." *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y.

1996) (internal quotation marks omitted) (citation omitted).

Section 523(a)(2)(B) "is an exception to the broad sweep of subsection (A)." *Weiss v.

Alicea* (*In re Alicea*), 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999). It excepts from the discharge of

an individual debtor, from any debt

> for money, property, services, or an extension, renewal, or refinancing of credit,
> to the extent it was obtained by –
>
> . . . .
>
> (B) use of a statement in writing –

---

[30] Each element under section 523(a)(2)(A) has its own formulation of scienter. "False pretenses" requires "conscious deceptive or misleading conduct." *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y.2000); *In re Diamond,* 2024 WL 4099893, at *5. "False representation" requires "intent to defraud," *In re Drummon*, 2023 WL 628605, at *15; but that requirement is sometimes expressed as "intent to deceive," *Sharmat v. Gallen (In re Gallen)*, 559 B.R. 349, 356 (Bankr. S.D.N.Y. 2016); *In re Diamond*, 2024 WL 4099893, at *5. "Actual fraud" specifically requires "intent to deceive." *In re Diamond*, 2024 WL 4099893, at *5.

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

"Exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *Murphy v. Snyder (In re Snyder)*, 939 F.3d 92, 101 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir. 2007)); *accord In re Drummon*, No. 19-10670, 2023 WL 8291564, at *15 (Bankr. S.D.N.Y. Nov. 30, 2023), *aff'd*, No. 24-CV-1668, 2025 WL 1327191 (S.D.N.Y. May 7, 2025). This approach reflects the underlying policy goal of giving honest debtors an opportunity for a fresh start where failure to achieve a discharge could become a "financial death sentence." *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007); *see also Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018) ("One of the 'main purposes' of the federal bankruptcy system is 'to aid the unfortunate debtor by giving him a fresh start in life, free from debts, except of a certain character.'" (quoting *Stellwagen v. Clum*, 245 U.S. 605, 617 (1918)).

In an exception to discharge action, the creditor-plaintiff bears the burden of proof on all elements of the claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006). "In weighing the evidence, 'a bankruptcy court must construe the evidence strictly against the creditor and liberally in favor of the debtor.'" *In re Gumbs*, 663 B.R. at 236 (quoting *Reddy v. Melnik (In re Melnik)*, 592 B.R. 9, 21 (Bankr. N.D.N.Y. 2018), *aff'd sub nom. Reddy v. Melnik*, No. 3:18-CV-1197, 2019 WL

2766592 (N.D.N.Y. July 2, 2019), *aff'd sub nom. In re Melnik*, Nos. 19-2367, 20-1634, 2021 WL

5987010 (2d Cir. Dec. 17, 2021)).[31]

**Relief Under Section 523(a)(2)(A)**

Sections 523(a)(2)(A) and (B) both include the phrase "respecting the debtor's or an

insider's financial condition." Section 523(a)(2)(A) excludes from its scope, "*any* 'materially false

statement'—written or oral—'respecting . . . the debtor's *financial condition*.'" *Global Injury*

*Funding, LLC v. Knight (In re Knight)*, 538 B.R. 191, 203 (Bankr. D. Conn. 2015) (emphasis in

original). And "[w]hile subsection (a)(2)(A) specifically provides that it is inapplicable to

statements regarding the debtor's financial condition, subsection (a)(2)(B) covers only statements

regarding the debtor's financial condition." *Citik Ka Wah Bank Ltd. v. Wong (In re Wong)*, 291

B.R. 266, 274 (Bankr. S.D.N.Y. 2003). Accordingly, if a statement is one "respecting the debtor's

or an insider's financial condition," then the subject debt is excluded from section 523(a)(2)(A),

and is nondischargeable only to the extent that it satisfies all of the requirements of section

523(a)(2)(B). *In re Knight*, 538 B.R. at 203. "[S]ections 523(a)(2)(A) and 523(a)(2)(B) are

mutually exclusive." *In re Wong*, 291 B.R. at 274.

Fonz contends that Rubin's failure to disclose the Melfi/Parzych Demand Letter is an

omission that constitutes false pretenses/misrepresentations respecting CBB's financial condition

that except the Rubin Debt from discharge under section 523(a)(2)(A). Fonz F&C ¶¶ 54, 60-61,

---

[31] Citing *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996), Fonz contends
that the Second Circuit does not mandate that evidence be construed strictly against the creditor. Fonz Reply at 14.
The Court finds no merit to that contention. As relevant, *Chalasani* addressed rules governing relief under section 727
of the Bankruptcy Code. The passage partly quoted by Fonz states, in full, as follows:

> Clearly, § 727 imposes an extreme penalty for wrongdoing. As such, we have held that it must be
> construed strictly against those who object to the debtor's discharge and "liberally in favor of the
> bankrupt."

92 F.3d at 1310 (citation omitted). That standard does not apply to cases under section 523(a)(2). *See In re Snyder*,
939 F.3d at 101.

66-67.[32] Rubin disputes that contention. He maintains that statements concerning a debtor's financial condition, including statements about a single asset or liability, are actionable only under section 523(a)(2)(B), not section 523(a)(2)(A). Rubin Memo at 5-7. Citing *Appling,* 584 U.S. 709, Rubin argues that "a statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Id.* at 6. Rubin contends that Fonz's allegations regarding Rubin's failure to disclose the $150,000 Debt and Melfi/Parzych Demand Letter relate to his financial condition, and can only be evaluated under Section 523(a)(2)(B). *Id.* at 7. He argues that the Court must grant judgment dismissing Fonz's claim for relief under section 523(a)(2)(A).

In *Appling*, the Supreme Court addressed whether a debtor's oral statements about an expected tax refund constituted a "statement respecting the debtor's financial condition" under section 523(a)(2). *Appling,* 584 U.S. at 712-13. The debtor ("Appling") owed over $60,000 to his law firm ("Lamar") for legal services. *Id.* at 713. Appling orally represented to Lamar that he expected a tax refund of approximately $100,000, inducing Lamar to continue its representation of Appling without immediate payment. *Id.* Appling received the refund (in an amount significantly less than $100,000), but used it to fund business expenses, and later misrepresented that he had not yet received it. *Id.* After Appling filed for bankruptcy, Lamar argued the debt was nondischargeable under section 523(a)(2)(A) as arising from false representations. *Id.* at 713-14. Appling countered that his debt was not excepted from discharge because his statements about the tax refund were oral statements "respecting" his financial condition, that did not satisfy section 523(a)(2)(B)'s writing requirement. *Id.*

---

[32] The Fonz F&C contains two paragraphs numbered "54." The Court refers to the latter paragraph here.

In reversing the district court, the Eleventh Circuit held that a statement about a single asset, such as Appling's tax refund, was a "statement respecting the debtor's financial condition." *Appling v. Lamar, Archer & Cofrin, LLP (In re Appling)*, 848 F.3d 953, 961 (11th Cir. 2017). The Eleventh Circuit rejected Lamar's argument that such statements must describe the debtor's overall financial status, like a balance sheet. *Id.* at 959. It reasoned that the term "respecting" has a broad ordinary meaning, encompassing statements with a "direct relation to or impact on" the debtor's financial status. *Id.* at 958. The Eleventh Circuit found that a statement about a single asset impacts the debtor's financial condition by demonstrating solvency or ability to pay, thus falling under section 523(a)(2)(B). *Id.* Because Appling's statements were oral, they did not meet the writing requirement under section 523(a)(2)(B), and the debt was dischargeable. *Id.* at 961.

The Supreme Court affirmed, holding that a statement about a single asset can be a "statement respecting the debtor's financial condition." *Appling*, 584 U.S. at 720. In part, the Supreme Court looked to the plain language of the statute and the meaning of the word "respecting." It noted that "[u]se of the word 'respecting' in a legal context generally has a broadening effect, ensuring that the scope of the provision covers not only its subject but also matters relating to the subject." *Id.* at 717 (citation omitted). The Supreme Court found "that a statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status[,]" and that "a statement about a single asset can be a 'statement respecting the debtor's financial condition.'" *Id.* at 720. The Supreme Court reasoned that "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.* Because Appling's statements

were not in writing, they did not satisfy section 523(a)(2)(B), and the debt was dischargeable. *Id.* at 724.

Prior to the Supreme Court's decision in *Appling*, in *In re Alicea*, 230 B.R. 492, this court adopted a narrow interpretation of the term "respecting" as used in section 523(a)(2). At issue there was whether oral statements by the debtor ("Alicea"), that he and his affiliates lacked the present ability to pay for legal services, and that he would pay them out of the proceeds of certain asset sales, constituted statements "respecting" his or his affiliates' financial condition. *Id.* at 500-04. The court adopted the "strict view," holding that such statements must reflect the debtor's overall financial responsibility, such as balance sheets or income statements, rather than the condition of a single asset or liability. *Id.* at 502-03. The court found that Alicea's promise to pay the legal fees out of the proceeds of an asset sale implied the value of a single asset and was not a statement respecting Alicea's financial condition that was actionable under section 523(a)(2)(A). *Id.* at 504. However, it found that Alicea's statement that he or his affiliates lacked the present ability to pay was a statement of insolvency—a type of financial condition—falling under section 523(a)(2)(B). *Id.* The *Alicea* court supported its narrow construction of the term "respecting" by citing legislative history and bankruptcy policy, reasoning that a broad reading of the term would allow dishonest debtors to escape nondischargeability for oral misrepresentations. *Id.* at 502-03. It distinguished the "broad view" adopted by other courts, which included statements about the condition or quality of a single asset or liability impacting the debtor's financial picture. *Id.* at 502-03 (citing *Beneficial Nat'l Bank v. Priestley (In re Priestley)*, 201 B.R. 875, 882 (Bankr. D. Del. 1996) (misrepresentation of conditions to purchase an asset); *Engler v. Van Steinburg*, 744 F.2d 1060, 1061 (4th Cir. 1984) (representation that debtor owned property free and clear of liens); *Hudson Valley Water Resources, Inc. v. Boice (In re Boice)*, 149 B.R. 40, 46 (Bankr. S.D.N.Y. 1992)

(statement concerning home ownership); *Connecticut Nat'l Bank v. Panaia* (*In re Panaia*), 61 B.R. 959, 960-61 (Bankr. D. Mass. 1986) (statement about amount of indebtedness owed to a bank); *Citizens & Northern Bank v. Phillips* (*In re Phillips*), 27 B.R. 646, 647 (Bankr. M.D. Pa. 1982) (statement about encumbrances on assets)).

In *Appling,* the Supreme Court expressly rejected the narrow interpretation of the term "respecting" applied in *Alicea*. 584 U.S. at 719-20. Accordingly, this Court will adopt the broad construction of the term that *Alicea* rejected. Under this reading of the statute, a statement "respecting" the debtor's or an insider's financial condition includes any representation with a direct relation to or impact on the debtor's or an insider's financial status, encompassing statements about a single asset or liability. Examples from the cases cited in *Alicea* illustrate this scope: a misrepresentation about the conditions of purchasing an asset (*Priestley*, 201 B.R. at 882), a claim of owning property free of liens (*Engler*, 744 F.2d at 1061), a statement about home ownership (*Boice*, 149 B.R. at 46), a representation about the amount of a specific debt (*Panaia*, 61 B.R. at 960-61), or a statement about encumbrances on assets (*Phillips*, 27 B.R. at 647). So too does *Pentagon Federal Credit Union v. Fernandez Tineo (In re Fernandez Tineo)*, No. 18-14005, 2019 WL 6339877 (Bankr. S.D.N.Y. Nov. 26, 2019), a post-*Appling* decision. There, the court found that the debtor's misrepresentation on his loan application that the earned a monthly salary of $8,853.70 "is arguably a written statement 'respecting the debtor's . . . financial condition,' and excepted from discharge, if at all, only under [section 523(a)(2)(B)]." *Id.* at *3. These cases demonstrate that statements affecting the debtor's financial picture, even if limited to a single asset or liability, qualify as "respecting" the debtor's financial condition because they influence the creditor's perception of the debtor's ability to pay or overall solvency.

In executing the 2019 Consolidated Note, CBB failed to disclose that it was subject to threatened litigation with Melfi and Parzych. Without addressing *Appling*, Fonz claims that Rubin's failure to disclose the Melfi/Parzyck Demand Letter constitutes a false representation under section 523(a)(2)(A). Fonz Memo at 13. Rubin disputes that contention. He argues that the failure to disclose the letter is an omission regarding CBB's financial condition and is actionable, if at all, only under section 523(a)(2)(B), because it has a direct relation to or impact on CBB's overall financial status. Rubin Memo at 6-7. The Court credits that argument.

The demand letter reflects a potential liability that could affect CBB's solvency or capacity to meet its obligations, akin to the statement about a specific debt in *In re Panaia*, 61 B.R. at 960-61, where the debtor's representation about the amount owed to a bank was deemed to impact financial condition. Similarly, like the statement about encumbrances on assets in *In re Phillips*, 27 B.R. at 647, the nondisclosure here conceals a liability that distorts the picture of CBB's financial health. The Melfi/Parzych Demand Letter pertains to a specific liability of CBB, as it asserts a claim against CBB that increases its aggregate debt obligations and could impair its ability to repay Fonz. Under *Appling*'s broad construction, the nondisclosure of the letter is a statement "respecting" CBB's financial condition because it has a direct relation to or impact on CBB's overall financial status. *See Appling*, 584 U.S. at 720.

The Court finds that the Melfi/Parzych Demand Letter is a statement respecting CBB's financial condition. As a matter of law, it fails to support a claim under section 523(a)(2)(A). *In re Knight*, 538 B.R. at 203; *In re Wong*, 291 B.R. at 274. The Rubin Debt is not excepted from discharge under section 523(a)(2)(A) of the Bankruptcy Code.

**Claims Under Section 523(a)(2)(B)**

In *In re Boice*, the court succinctly summarized the five elements of a claim under section

523(a)(2)(B), as follows:

> First, there must be a writing. Second, the writing at issue must be materially
> false. Third, the writing must concern the debtor's financial condition. Fourth,
> the creditor must have reasonably relied upon the writing. And, fifth, the debtor
> must have caused the writing to be made or published with the intent to deceive
> the creditor.

144 B.R. at 45.

The CBB Debt Schedule purports to list the current balance of debts due and owing by

CBB/TCB as of February 26, 2019. It shows debts aggregating approximately $5 million. The

"Friends and Family" section of the schedule includes debts arising out of the Fonz Loans

($1,265,000), Rubin Claim ($2,268,000), "Melfi Loan" ($270,000), and certain of the Friends and

Family loans ($921,500).[33] It does not list the Parzych Note or the $150,000 Debt. Fonz seeks a

judgment denying the discharge of the Rubin Debt under section 523(a)(2)(B), based on those

omissions from the CBB Debt Schedule. Rubin contends that Fonz has failed to meet its burden

of proof under this section and that the Court must dismiss that claim.

The CBB Debt Schedule is a statement in writing respecting an insider's (i.e., CBB's)

financial condition, as it directly relates to its financial obligations. *Appling,* 584 U.S. at 717.

Moreover, based on its omission of the Parzych Note and the $150,000 Debt, the statement is false.

*See European American Bank v. Launzel-Pennes (In re Launzel-Pennes)*, 191 B.R. 6, 11 (Bankr.

E.D.N.Y. 1996) ("The law is clear that writings containing pertinent omissions may qualify as

---

[33] Those are loans from Frears, Frears & Yellin, Gersten, Orans and Lilling. The schedule of debt also includes debts to Amex ($203,576) and Argus Capital Funding ($16,125). They are not included in the "Friends and Family" portion of the schedule.

'materially false' for purposes of a section 523(a)(2)(B) violation."). Rubin denies: (i) that the CCB Debt Schedule is materially false, (ii) that in entering into the Refinancing Transaction, Fonz reasonably relied on the CBB Debt Schedule, and (iii) that CBB omitted the Parzych Note and $150,000 Debt from the CBB Debt Schedule with an intent to deceive Fonz. He contends that Fonz has not met its burden of establishing those elements of a claim under section 523(a)(2)(B).

The Court considers those matters below.

### *Material Falsity*

"The element of materiality under § 523(a)(2)(B)(i) is a question of law." *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1115 (3d Cir. 1995) (citations omitted). A statement is "materially false" if it "paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 625 (2d Cir. 1996) (internal quotation marks omitted); *accord Capozzolo v. AKF, Inc.,* 626 F. Supp. 3d 604, 609 (S.D.N.Y. 2022) (quoting *In re Furio* 77 F.3d at 625). The materiality element is an objective one, focusing on whether the lender would have made the loan had it known the debtor's true financial picture. *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) ("A recurring guidepost used by courts has been to examine whether the lender would have made the loan had he known of the debtor's true financial condition."); *accord In re Cohn*, 54 F.3d at 1114.

Rubin denies that the CBB Debt Schedule is materially false. He reasons that the $150,000 Debt is less than 5% of the $5 million of debt listed in the schedule, and the Rubin Businesses' books and records referred to Melfi and Parzych notes collectively as the "Melfi Loan" and never referred to the Parzych Note. Rubin Reply at 9-10. Fonz counters with a number of arguments that the Court considers below.

It contends that in assessing the materiality of the omission to the accuracy of the schedule, the Court must exclude both the Fonz Loans and the Rubin Claim. Fonz F&C ¶ 82. Fonz asserts that the Rubin Claim presumably includes claims for "unpaid salary" and alleged loans to the Rubin Businesses from Rubins's personal funds. Fonz challenges the validity of the claim, noting that during the period of January through October 2019 alone, Rubin received over $100,000 from The City Bakery payroll, and that unlike Fonz, Rubin had the benefit of directing CBB and TCB to repay his so-called loans from TCB's accounts. Fonz F&C ¶ 81. The Court finds no merit to those arguments. The Fonz Claim is relevant to the materiality of the omission to the statement, as Fonz viewed the claim as debt to be repaid by CBB. Moreover, nothing in the record supports Fonz's contention that Rubin was required to document his unpaid salary, or that the salary and loans underlying the claim, were not due and owing to him. And there is no proof that had the actual amount of the Rubin Claim been less than the amount stated in the CBB Debt Schedule, that Fonz would not have gone forward with the Refinancing Transaction.

Fonz also argues that the omission of the $150,000 Debt from the CBB Debt Schedule was material because the fact of "the revelation of another discrepancy [in the aggregate debt of Rubin Businesses] after weeks of contentious negotiations would impact [its] decision to waive defaults and extend the time to repay." Fonz F&C ¶ 79; *see also id.* ¶ 39 ("[A]fter the discrepancies discovered in October and November of 2018, revising the indebtedness schedule to accurately reflect the Melfi/Parzych [notes] would have been a red flag for Fonz that would have derailed the [Refinancing Transaction]."). The Court does not credit that argument. First, at trial, Yoshii did not testify that had Fonz been aware of the $150,000 Debt, it would have refused to enter into any refinancing agreement with CBB. Rather, he stated that had he known the full extent of CBB's Debt Schedule, "I probably wouldn't have agreed to – or I had agreed on the Terms. I may have

changed the terms or maybe I just stopped signing." (Tr. Day 1, at 54:14-16 (Yoshii)); *see also* (Tr. Day 2, at 158:11-19 (Yoshii) (testifying that had he known about the understatement, he "wouldn't have done the deal . . . [i]n the same terms, no."). In other words, knowledge of the understated debt might have led to different terms or further negotiation, but Yoshii did not testify that Fonz would have categorically refused to proceed with any transaction or elected to foreclose on its existing defaulted loans.

Moreover, the record is clear that Fonz did not approach the defaults under the Fonz Notes like a secured creditor seeking to enforce its rights under the notes. In the face of the defaults under the July and September Promissory Notes, Fonz loaned an additional $540,000, on the condition that the loan proceeds be used to satisfy secured debt encumbering the Rubin Businesses' assets. It also proposed transactions in which it would acquire all or portions of the Rubin Businesses, in an exchange for the Fonz Notes. *See* October 2018 Transaction, December 2018 Acquisition Proposal, December 2018 Term Sheet. Fonz was a fully secured creditor whose claims were secured by liens on the Rubin Businesses. It wanted to be those businesses' only secured creditor. Tr. Day 2, at 56:6-8 (Schatz) ("[T]he only thing that [Yoshii] was very clear on was that [Fonz] wanted . . . to be the only secured creditor involved in this."). Fonz never exercised its remedies under the Fonz Notes. On the two occasions Fonz threatened litigation, it did not pursue it.

In support of its argument, Fonz relies on *In re Boice*, 149 B.R. 40, *Capozzolo v. AKF, Inc.*, 626 F. Supp. 3d 604, and *In re Furio*, 77 F.3d 622 (2d Cir. 1996). In *Boice*, the debtors falsely represented in three written statements that they owned their residence, a fact the creditor's president testified was decisive to extending financing on a recourse basis. *In re Boice*, 149 B.R. at 46. The court found those misrepresentations materially false because the loan would not have been made absent that representation. *Id.* at 45-46. In *Capozzolo*, the debtor omitted a $232,000

liability from a debt schedule provided to the lender, and the court found the omission materially false where the lender's CEO attested that the funds would not have been advanced had the debt been disclosed. *Capozzolo*, 626 F. Supp. 3d at 609. By contrast, in *Furio*, the Second Circuit found that omission of a $140 monthly child support obligation was not materially false because correcting for that omission did not alter the debtor's true debt-to-income ratio or the credit union's decision to extend credit. 77 F.3d at 625. However, these cases are inapposite. Unlike *Boice* and *Capozzolo*, where the misstatements directly induced the extension of new credit under the lender's criteria, Fonz did not advance new funds in the Refinancing Transaction, and there is no evidence that disclosure of the omitted $150,000 Debt would have altered Fonz's decision to consolidate the Fonz Notes. And unlike *Furio*, Fonz has not shown, through any objective evidence, that the omission here materially misrepresented CBB's financial condition in a way that affected its decision-making.

Next, Fonz asserts that given the known financial pressures facing the Rubin Businesses, the threat of litigation with Melfi and Parzych would have been an important consideration for Fonz, as Fonz's ability to collect under the 2019 Consolidated Note would be diminished if CBB and Rubin were burdened by additional debt and active or threatened lawsuits. Tr. Day 1, at 45:3-6 (Yoshii). However, in assessing its financial risk in proceeding with the Refinancing Transaction in lieu of commencing a foreclosure action, the threat of litigation against the Rubin Businesses from the lenders identified in the CBB Debt Schedule could not have been a material consideration for Fonz. That is because Fonz was fully secured in the assets of the Rubin Businesses, DX-S, and the debts listed in the CBB Debt Schedule were not secured (if at all) by the Rubin Businesses' assets. The Melfi and Parzych Notes were secured by liens on Rubin's assets. PX-6. Those assets did not serve as collateral for the Fonz Loans. Moreover, Fonz had insured that all other secured

creditors had been paid off with the $540,000 in proceeds from the November Promissory Note, by making that a condition to the funding of the note. Tr. Day 2, at 12:2-25, 14:6-22 (Schatz); Tr. Day 1, at 34:16-25 (Yoshii). Further, there was no financial risk to Fonz in foregoing litigation and proceeding with the Refinancing Transaction. Fonz did not advance any new funds in support of the transaction. Rather, it refinanced its fully secured short-term loans to Rubin Businesses, extinguished the Fonz Notes, and issued the 2019 Consolidated Note with an approximately six-month maturity date of June 13, 2019.

The Court assesses the materiality of the omission of the Parzych Note and $150,000 Debt from the Refinancing Transaction documents in the context of the entire transaction. Although Fonz assumed no meaningful financial risk in entering into the Refinancing Transaction, it realized material benefits under the transaction. Significantly, the 2015 License Amendment removed most, if not all, of the restrictions on Fonz's operations of The City Bakery licensed restaurants. *See* DX-T; *see also* Tr. Day 1, at 136:6-25 (Yoshii); Tr. Day 2, at 128:24-129:5 (Rubin). Moreover, the territory covered by license extended to Singapore, Thailand, the Philippines and Vietnam. DX-T. In addition, the Intellectual Property Acquisition Agreement transferred the Japanese registration of the "The City Bakery" trademark to CB Singapore. *See* DX-U. The negotiations focused extensively on these licensing benefits, which were central to Fonz's strategic interests in growing its operations in Japan and beyond. The Melfi and Parzych Notes, tied primarily to CBB's repayment capacity, were tangential at best to these broader gains. Fonz has not demonstrated that accurate disclosure of the $150,000 Debt would have affected its willingness to proceed with the Refinancing Transaction, given the transaction's emphasis on licensing expansions rather than CBB's short-term debts.

In February 2019, Fonz was well aware of the financial problems plaguing the Rubin Businesses. Indeed, as of February 2019, CBB was in default under over $1 million in Fonz Loans, and CBB disclosed approximately $3.8 million of debt, in addition to those loans. CBB's failure to disclose the Parzych Note and the $150,000 Debt in the CBB Debt Schedule simply did not "paint[] a substantially untruthful picture of [CBB's] financial condition[.]" *In re Furio*, 77 F.3d at 625. The roughly 3% discrepancy between the CBB Debt Schedule and the total amount of its indebtedness was not material to an accurate picture of CBB's financial condition, especially to a counter-party that through mid-2019 had full access to CBB's book and records. The potential litigation with Melfi and Parzych was not material to Fonz's attempt to acquire the Rubin Businesses as the underlying indebtedness was not secured by liens on the business assets.

Fonz has failed to meet its burden of demonstrating the CBB Debt Schedule is materially false.

### *Reliance*

Fonz contends that Rubin "misrepresent[ed] CBB's financial condition [and] should not be allowed to shift the burden on its lender." Fonz F&C ¶ 84. It maintains that "[it] was entitled to rely on the governing agreements because the documents were heavily negotiated and Rubin and his companies were represented by multiple lawyers, who had a chance to closely review and negotiate the representation, warranties and disclosures." *Id.* Fonz disputes Rubin's contention that he was completely transparent in connection with Refinancing Transaction. It asserts that Rubin controlled the flow of information and that while he had given access to Fonz to all of his accountants, books and records and Niarchos, they provided only the information Rubin gave to them. *Id.* ¶ 86. In August 2018, Fonz requested the production of "any agreements for loans, advances, borrowed money, or the sale of future accounts to which The City Bakery, LLC or City

Bakery Brands, LLC is a party, whether as borrower, security grantor, guarantor, or otherwise."
August 20, 2018 Email. Fonz requested that documentation to evaluate CBB's ability to pay. Tr.
Day 1, at 107:17-18 (Niarchos). Fonz did not receive the "Melfi Loan" documents. Fonz denies
that it could have discovered the information regarding those loans through its own investigations
because Rubin "control[ed] the flow of information and no one else had independent knowledge
and records with respect to the Melfi and Parzych [Notes]." Fonz F&C ¶ 85. It says that "[it] had
no other choice but to rely on the list of indebtedness prepared by Kristin Edwards Niarchos under
Maury Rubin's guidance." *Id.*

Under section 523(a)(2)(B), a creditor must establish reliance on the debtor's materially
false written statement respecting the debtor's financial condition and that such reliance was
reasonable. *See* 11 U.S.C. § 523(a)(2)(B)(iii); *see also In re Boice,* 149 B.R. at 46 ("Code §
523(a)(2)(B)(iii) specifies that a creditor must establish two elements. Not only must the creditor
demonstrate that it relied upon the false financial statement, but it also must establish that its
reliance was reasonable."). Reasonable reliance under § 523(a)(2)(B)(iii) is a question of fact.
*Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 305 (2d Cir. 1996). To
satisfy the element of "reasonable reliance" on the CBB Debt Schedule, Fonz must first
demonstrate that in entering into the Refinancing Transaction, it actually relied on the schedule. *In
re Cohn,* 54 F.3d at 113 ("Section 523(a)(2)(B)(iii) . . . requires that the creditor *actually rely* on
the debtor's statement. Accordingly, if it were reasonable to rely on a debtor's statement, but the
creditor did not in fact rely upon the false statement, (B)(iii) would not be satisfied."); *accord
Marina District Development Co. LLC v. Park (In re Park)*, 492 B.R. 668, 683 (Bankr. S.D.N.Y.
2013) ("[S]ubsection B(iii) 'requires that the creditor *actually rely* on the debtor's statement.' And

'if it were reasonable to rely on a debtor's statement, but the creditor did not in fact rely upon the false statement, (B)(iii) would not be satisfied.'" (quoting *Cohn*, 54 F.3d at 1115)).

Fonz requested the production of the loan agreements identified in the August 20, 2018 Email to evaluate CBB's ability to repay the loans Fonz would make. At that time, Fonz had advanced $200,000 to CBB, pursuant to the secured July Promissory Note. CBB produced documents regarding all the Friends and Family loans, except for the Melfi And Parzych Notes. CBB never produced documents relating to those loans. Tr. Day 1, at 107:17-18 (Niarchos). Without those documents, Fonz advanced an additional $640,000 under the September and November Promissory Notes and refinanced over $1 million in Fonz Loans under the Refinancing Agreement.

In that light, it is clear that in entering into the Refinancing Transaction, Fonz placed little to no weight on the CBB Debt Schedule. Fonz was not advancing new funds to CBB. Its focus was not on CBB's credit risk; it was on the substantial business concessions it was able to negotiate with Rubin – that would remain in force and effect in the event CBB and TCB defaulted under the 2019 Consolidated Note. These included concessions that Fonz sought and Rubin rejected under the October 2018 Transaction and December 2018 Term Sheet. As noted, under the under the 2015 License Amendment, the license territory expanded to Japan, Singapore, Thailand, the Philippines and Vietnam and the restrictions on Fonz's operations of the businesses were eliminated.[34] Moreover, under the Intellectual Property Acquisition Agreement, CBB and TCB transferred the Japanese registration of the trademark of The City Bakery to CB Singapore. DX-U.

---

[34] The effects of Amendment No. 1 to License Agreement included the removal of most, if not all, of the restrictions on the licensee, the approval rights of the licensor or Rubin, and the rights of the licensor or Rubin to terminate based on the licensee's failure to comply, such as with respect to quality control or menu items. Tr. Day 1, at 136:20-25 (Yoshii); Tr. Day 2, at 130:1-17 (Rubin).

The case of *In re Park*, 492 B.R. 668, is instructive. There, a casino extended $110,000 in credit to a debtor, a compulsive gambler, under markers that included preprinted statements representing that funds were "on deposit" in his specified bank account to cover the markers. *See id.* at 672. The debtor did not have the funds in that account. After he defaulted under the markers, debtor declared bankruptcy. The casino sought to deny the discharge of his gambling debts under section 523(a)(2)(A) and (B). After trial, the court granted judgment in favor of the debtor. In part, the court held that in extending credit to the debtor, the casino did not rely on the debtor's representations in the marker regarding funds on deposit in a specific account. The casino's decision to extend credit to the debtor was driven by the debtor's long-term "pay and play" history—borrowing and repaying over $1.5 million in prior transactions—rather than the specific account balance. *Id.* at 689-690. The casino "wanted [the debtor's] continuing business [and] took steps . . . to continue to attract to attract him as a patron, and to get him to gamble . . . even more. *Id.* at 678. The court found that the casino "was well aware of, and relied upon, the [d]ebtor's gambling, borrowing and repayment history . . . not the statements that had been imprinted on the markers." *Id.* Here, in agreeing to the Refinancing Transaction, Fonz did not rely on CBB's creditworthiness. It relied on the material benefits it realized under the Refinancing Transaction.

Furthermore, in light of the fact that no new funds were extended by Fonz in the Refinancing Transaction, Tr. Day 1, at 134:18-20 (Yoshii), and the material benefits received by Fonz from the 2015 License Amendment, DX-T, and the Intellectual Property Acquisition Agreement, DX-U, including the removal of restrictions on the Japanese operations of the City Bakery licensed restaurants, Tr. Day 2, at 129:6-130:17 (Yoshii), Fonz has failed to demonstrate that it relied on the CBB Debt Schedule in agreeing to the Refinancing Transaction. Actual reliance is an element of reasonable or justifiable reliance. Fonz has failed to meet its burden of establishing

49

that in entering into the Refinancing Transaction, it actually, or reasonably relied on the CBB Debt

Schedule.

### Intent to Deceive

Intent to deceive under section 523(a)(2) can be satisfied if the debtor acted with reckless

disregard for the truth, with the recklessness of the debtor's behavior determined from the totality

of the circumstances. *See In re Bonnanzio*, 91 F.3d at 301 ("[I]ntent to deceive can be inferred

from the totality of the circumstances, including reckless disregard." (applying its ruling to section

523(a)(2)(B))). "Proving the element of deceptive intent under [Bankruptcy] Code

§523(a)(2)(B)(iv) is often difficult, as [a debtor] will rarely admit to such intent." *In re Boice,* 149

B.R at 47 (citations omitted); *see also Municipal Credit Union v. Brown (In re Brown),* 55 B.R.

999, 1004 (Bankr. E.D.N.Y. 1986) ("[I]t is virtually impossible to obtain direct proof of one's

intent."); *Burbank v. Capelli (In re Capelli)*, 261 B.R. 81, 91 (Bankr. D. Conn. 2001) ("Intent to

deceive is rarely established by direct evidence.") (citations omitted).

Accordingly, courts recognize that "[i]ntent to deceive may be inferred when the totality

of the circumstances depicts deceptive conduct by the debtor." *In re Boice*, 149 B.R. at 47 (citations

omitted). "To this end, [a plaintiff] must prove that [a debtor] made the statement knowing either

that it was false, or that it was made with such reckless disregard of the truth so as to be the

'equivalent of intent to defraud.'" *Id.* (quoting *Town North Nat'l Bank v. Biedenharn*, 30 B.R. 342,

345 (Bankr. W.D. La. 1983)); *see also McDonald v. Dunnett (In re Dunnett)*, No. 11-62156, Adv.

No. 11-80038, 2013 WL 2352244, at *11 (Bankr. N.D.N.Y. May 29, 2013) ("Because direct proof

of a debtor's subjective state of mind is generally unavailable, a debtor's knowledge and intent

may be inferred from the totality of the circumstances, including a reckless disregard for the truth

or falsity of the statements submitted." (citing *In re Bonnanzio*, 91 F.3d at 301-02)).

Fonz asserts that notwithstanding that Rubin was fully informed about the existence of the

Melfi and Parzych Notes, the defaults under the notes, and the Melfi/Parzych Demand Letter, he

continuously misrepresented to Fonz the facts relating to those loans. Fonz F&C ¶ 70. Fonz asserts

that Rubin knew the CBB Debt Schedule omitted the Parzych Note and $150,000 Debt, but did

nothing to correct those errors. Fonz maintains Rubin concealed the truth about those matters

because he knew that disclosure of the Parzych Note and the $150,000 Debt would have derailed

the Refinancing Transaction. It argues that this "pattern of falsity" establishes Rubin's "[r]eckless

disregard of the truth" in failing to disclose the Parzych Note and $150,000 Debt, and Rubin's

"intent to deceive" under section 523(a)(2)(B)(iv) of the Bankruptcy Code. *Id.*

Rubin denies that in submitting the CBB Debt Schedule he disregarded the status of the

"Melfi Loan," or intended to deceive Fonz about the status of those loans. There is no proof that

Rubin gave Fonz a statement of the amount of the debt owed to Melfi and Parzych that he knew

to be untrue. To the contrary, in February 2019, Rubin believed that the reference in the CBB Debt

Schedule to the "Melfi Loan" with an outstanding amount of $270,000, correctly reflected the

existence and status of the Melfi and Parzych Notes. *See* Tr. Day 2, at 22:15-16 (Rubin) (Testifying

that when he executed the Refinancing Transaction documents, "[he] believed that the amount

listed for the Melfi debt in Exhibit B was correct"); *see also* Tr. Day 2, at 135:22-24 (Rubin) (When

questioned whether he intentionally said anything false in CBB Debt Schedule, Rubin responded,

credibly, "No. No. I never said anything intentionally I believed to be false to anybody I did

business with, in 28 years."). Moreover, Rubin did not intentionally omit a reference to the Parzych

Note, as the record is clear that he consistently referred to the Melfi Note and Parzych Note

collectively as the "Melfi Loan." *See, e.g.*, Tr. Day 1, at 103:16-19, 107:4-5 (Niarchos); Tr. Day

2, at 90:16-21 (Rubin) (regarding consistent reference to loans as "Melfi Loan").

Still, Fonz contends Rubin is "precluded" from arguing that he believed that he had correctly scheduled the "Melfi Loan" in the CBB Debt Schedule because: (i) in February 2019, Rubin was aware of, ignored, and failed to disclose the Melfi/Parzych Demand Letter which claimed an aggregate amount due and owing under the Melfi and Parzych Notes of $415,125.32, PX-7, (ii) contemporaneous records in Rubin's possession or control listed the principal amount of the Melfi/Parzych Debt as $325,000, and emails between Niarchos and Rubin at various times in 2018 indicated that the principal amount under the "Melfi Loan" was $325,000 (citing PX-13, PX-23), (iii) Rubin's Bankruptcy Schedules list the Melfi Note and Parzych Note as "undisputed" debts aggregating $432,465.33, and (iv) Rubin actively concealed the Melfi Note and Parzych Note from Fonz by preventing Niarchos from producing documents related to those loans. Fonz Reply at 10; Fonz F&C ¶ 48.

The Court considers those matters below.

<u>The Melfi/Parzych Demand Letter</u>

Rubin was regularly in touch with Melfi in 2018 and contacted him in January of 2019. PX-39, PX-40. Rubin received the Melfi/Parzych Demand Letter before he executed the Refinancing Transaction documents. Fonz asserts that Rubin ignored the letter. Bankruptcy courts have found that a "failure to read [a] document, in and of itself, constitutes a reckless disregard for its accuracy." *Carver Fed. Sav. Bank v. Cedillo (In re Cedillo),* 573 B.R. 405, 444 (Bankr. E.D.N.Y. 2017) (quoting *First Fed. Savings & Loan Assoc. v. Kelley (In re Kelley)*, 163 B.R. 27, 36 (Bankr. E.D.N.Y. 1993)); *see also Long Island Trust Co. v. Rene Rodriguez (In re Rodriguez),* 29 B.R. 537, 541 (Bankr. E.D.N.Y. 1983) (holding that if a debtor does "not read a statement prepared for him by another party that would, in and of itself, constitute reckless disregard equivalent to intent."). Fonz argues that Rubin's lack of attention to the letter amounts to willful

blindness and reckless disregard of information he knew, should have known and should have shared with Fonz. Fonz F&C ¶ 74.

However, the record is clear that Rubin did not ignore the Melfi/Parzych Demand Letter. Upon receipt of the letter, Rubin reviewed it, and emailed it to David Barrack, Esq., one of his lawyers. Tr. Day 2, at 126:10-12 (Rubin). Mr. Barrack's involvement was interrupted by a death in his family. Tr. Day 2, at 222:13-19 (Rubin). Rubin did not further pursue the matter himself for two reasons. First, he believed the damage claim was overstated because it did not account for uncredited payments of the Melfi Note and Parzych Note. Second, he did not consider the matter pressing amid multiple business challenges, including efforts to sustain operations during financial distress. *See* Tr. Day 2, at 126:6-25 (Rubin). Finally, Rubin testified, credibly, that he did not connect the letter with the Rep in section 7.6 of the 2019 Consolidated Note that no litigation was threatened. *See* Tr. Day 2, at 127:22-24 (Rubin). In accounting for that oversight, he explained that at the time, he was "running the business and . . . trying to save the business. And I'm working I'm going to say 12, 14 hours a day. I'm sleeping two to three hours a night" Tr. Day 2, at 127:2-5 (Rubin). Rubin's response to the Melfi/Parzych Demand Letter does not support Fonz's claim for relief.

The Bankruptcy Schedules

Fonz is correct that the Bankruptcy Schedules "constitute[] a sworn statement and admission against interest, which is strongly probative of the claim's validity." Fonz Reply at 10 (quoting *In re Brown*, No. 18-10617, 2023 WL 6051957, at *8 (Bankr. S.D.N.Y. Sept. 15, 2023) (citing *In re Live Primary, LLC*, 626 B.R. 171, 189 (Bankr. S.D.N.Y. 2021)). However, Fonz misplaces its reliance on that case law. As of the Petition Date, the default judgment under the Debt Collection Action had been entered against Rubin. That judgment fixed the Melfi/Parzych

Debt at $432,465.33. Rubin was obligated to list all of his debts in the schedules, and to do so accurately.

Intent to deceive is evaluated based on the facts at the time of the representation, not subsequent developments. *See generally Rein v. Dutch Bros, Inc.*, No. 23-1794, 2024 WL 3105004, at *18 (S.D.N.Y. June 24, 2024) (a statement "cannot be impeached as false or misleading based on events that had not yet occurred or information that was not yet known to the speaker"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) (stating that a statement true when made does not become fraudulent due to later events, as fraud depends on the state of events at the time of the statement). Rubin's inclusion of the Melfi Note and Parzych Note in his Bankruptcy Schedules in December 2019, as undisputed debts in the aggregate amount fixed under the default judgment, does not support Fonz's contention that Rubin made a materially false statement concerning such debts in February 2019, prior to the entry of the judgment.

## CBB's Books and Records

The records maintained by RMG show an initial deposit of the proceeds of the "Melfi Loan" of $500,000 on December 27, 2013. DX-MM (spreadsheet showing transactions associated with "Melfi Loan"). Niarchos, who assisted Rubin with compiling and distributing The City Bakery financial information, including to Fonz, also always referred to this aggregated debt as "Melfi Loan." Tr. Day 1, at 103:17-19 (Niarchos). In internal communications and financial records, this debt was referenced as the "Melfi Loan." Tr. Day 2, at 90:16-21 (Rubin); Tr. Day 1, at 103:12-19, 107:4-5 (Niarchos). Niarchos explained that she assisted Rubin in preparing the CBB Debt Schedules based on data obtained from multiple sources, including Rubin and RMG. Tr. Day 1, at 60:18-62:14 (Niarchos). She accepted the data as submitted to her, and did not verify the information against payment confirmations or bank records; she relied on calculations based on

the original loan agreements and scheduled payment terms. Tr. Day 1, at 63:10-14, 67:15-23, 96:23-25 (Niarchos). Niarchos did not verify the information she received from Rubin and the accountants because, from her perspective, information collection "was never intended to be an exact science. It was giving a general ballpark of where those loans stood, which is why I didn't do that type of reconciliation." Tr. Day 1, at 67:20-23 (Niarchos). The CBB books and records showed the principal amount of the "Melfi Loan" as $325,000. In a June 5, 2018 email from Rubin to Niarchos, the "EVP Melfi" loan was listed at $325,000 Tr. Day 1, at 72:12 (Niarchos). Still, Rubin believed that the accounting records did not accurately reflect the outstanding amount of the combined debt to Melfi and Parzych, because they did not reflect a $100,000 payment made by Rubin to Melfi from his personal funds. Tr. Day 2, at 109:1-6 (Rubin).

The evidence, including Rubin's and Niarchos's testimony, points to disorganized record-keeping, not to calculated deception on Rubin's part. Indeed, in 2015, Yoshii characterized The City Bakery's books as "very messy" and difficult to verify. *See* Tr. Day 1, at 20:9-21:1 (Yoshii) ("Result of due diligence [in 2015] was that it was not easy to go through his books because it was very messy . . . . So it was very difficult to see what was real in the book"). Courts have distinguished such negligence from the reckless disregard required for intent under section 523(a)(2)(B). *See Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) (holding that negligence or poor judgment does not establish fraudulent intent, as the debtor's explanations, though reflecting inadequate management, did not demonstrate knowledge of falsity or recklessness); *cf. In re Capelli*, 261 B.R. at 92 (holding "failure to include over $137,000.00 in debt in the Financial Affidavit constitutes reckless disregard and total indifference to the truth" where debtor had knowledge of the debt, and offered explanations for the omissions, contending that the debts were omitted either because payments were contingent or the exact

balances were not available.) The Court finds that the variations in internal records, such as the $325,000 principal noted in 2018 emails, reflect inconsistencies attributable to unreconciled payments and informal tracking rather than deliberate falsification.

Disclosure of Melfi/Parzych Note Documents to Fonz

Fonz requested the production of "any agreements for loans, advances, borrowed money, or the sale of future accounts to which The City Bakery, LLC or City Bakery Brands, LLC is a party, whether as borrower, security grantor, guarantor, or otherwise." August 20, 2018 Email. In response, Niarchos made all the documents relating to the Friends and Family Loans available to Fonz, except for documents relating to the Melfi Note and Parzych Note. At Rubin's direction, she did not produce those documents. PX-19.

Fonz asserts that Rubin's instruction to Niarchos in August 2018 not to provide those documents during due diligence demonstrates an intent to withhold material information. The Court disagrees, and credits Rubin's explanation for this directive. Rubin testified that at the time of the request, he believed the figures related to the Melfi and Parzych Notes were inaccurate because they did not account for a $100,000 payment he had made from his personal bank account, a transaction to which the company's bookkeepers would not have had access unless he specifically informed them. He stated his instruction was based on his belief that the available numbers were "not right" and "not updated." Tr. Day 2, 182:7-12 (Rubin).

This explanation is corroborated by the testimony of Niarchos, who stated her understanding was that Rubin wished to provide signed versions of the documents rather than an unsigned one and asked her to "hold on" sending the unsigned one. Tr. Day 1, at 88:12-17 (Niarchos). Niarchos characterized the level of disclosure as "full disclosure," stating, "Enough so that I think we gave direct access to the program and the books[.]" Tr. Day 1, at 103:9-11

(Niarchos). While Rubin's initial instruction to withhold the unsigned Melfi and Parzych Notes was based on a stated desire to provide an accurate and finalized version, the record shows the signed documents were never provided to Fonz during the course of the negotiations. Tr. Day 1, at 107:174-18 (Niarchos). The Court, however, credits Rubin's testimony explaining this omission. Rubin described a state of extreme operational distress during this period, testifying that he was working 12 to 14-hour days, sleeping only two to three hours a night, and was entirely consumed with "trying to save the business." Tr. Day 2, at 127:3-21 (Rubin). His credible testimony indicates that his failure to follow up and provide the corrected documents was not an intentional act of concealment but an oversight resulting from the overwhelming pressures of a failing business. Tr. Day 2, at 127:22-24 (Rubin). He testified that upon receiving the Melfi/Parzych Demand Letter, which highlighted the debt discrepancy, he "let it sit" and did not connect its significance to the representations being made to Fonz, an omission he stated he later regretted. *Id.* The Court finds this explanation consistent with the evidence of disorganized record-keeping and the chaotic financial state of the Rubin Businesses at the time. The Court, therefore, finds that Rubin's isolated instruction, when viewed alongside the broader due diligence access Fonz was given and the credible explanation concerning the document's accuracy, reflects an issue of documentation management rather than a deceptive intent required to support a finding of fraud. Therefore, the Court views Rubin's failure to provide the updated Melfi and Parzych Notes as an omission attributable to mismanagement and operational crisis, rather than a deliberate and deceptive act designed to mislead Fonz.

Fonz relies on *In re Boice*, 149 B.R. 40, in support of its contention that reckless disregard of the truth is established by a pattern of falsity. Fonz F&C ¶ 70. In *Boice*, the bankruptcy court found that one of the joint debtors' misrepresentations of home ownership in connection with the

financed sale and installation of a water treatment system was made with such reckless disregard to the truth as to result in a finding of intent to deceive. In making this determination, the court listed three factors: (i) the admitted known falsity of the central representation,[35] (ii) the pattern of repetition of representation (three times in writing), and (iii) the debtor's lack of credibility in his trial testimony. *Id.* at 48.

Rubin contends, and the Court agrees, that Fonz has failed to establish any of the *Boice* factors. *See* Rubin Reply, at 12-13. Rubin has not admitted that he knew any representation in the CBB Debt Schedule was false. To the contrary, he testified that he believed the representations were true and accurate. Further, no representation was repeated in the documents underlying the Refinancing Transaction. Finally, the Court finds that Rubin testified truthfully at the trial.

Fonz has failed to meet its burden of demonstrating intent to deceive under section 523(a)(2)(B)(iv).

---

[35] The debtor testified that he was induced to making the misrepresentation of home ownership by a representation of the creditor who allegedly said that the credit application "would go through easier," *id.* at 43; a contention that the court rejected. *Id.* at 48.

## CONCLUSION

For the reasons stated herein, judgment will be entered in favor of Rubin. Pursuant to Rule 58 of the Federal Rules of Civil Procedure,[36] the Court directs Rubin to settle a separate standalone judgment in his favor consistent with this Memorandum Decision and Order. The time to appeal shall run from the date of its entry, and not from the date of this Memorandum Decision and Order.

IT IS SO ORDERED.

Dated: September 5, 2025
     New York, New York

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[36] Rule 58 is made appliable herein by Rule 7058 of the Federal Rules of Bankruptcy Procedure.